ISAAC P. CHRISTIANCY,
BENJAMIN F. GRAVES, } Associate Justices.
THOMAS M. COOLEY,

## M. Henry Roberts v. The People.

*Offenses charged with a particular intent: Proof of intent: Intent as affected by voluntary intoxication ; by insanity ; or by insanity produced by voluntary intoxication.* When a statute makes an offense to consist of an act committed with a particular intent, which act and intent constitute, substantially an attempt to commit a higher offense than that which was accomplished; proof of the particular intent is as necessary as of the act itself; but not, necessarily, by direct and positive testimony. It may be inferred from any facts in evidence which satisfy the jury of its existence. *People v. Scott, 6 Mich., 296.*

Voluntary intoxication will not excuse acts which constitute an offense. The criminal intent may be inferred, as a fact, from the acts. But when the offense charged is an act combined with an intent to commit an offense not actually committed ; and the jury are satisfied that the intoxication is of a degree which rendered the accused incapable of entertaining the particular intent charged; and that he had no such intent prior to the intoxication, nor any knowledge that he was liable, when intoxicated, to such a condition of mental disorder as would render him capable of the offense charged, they must acquit.

The question of the particular intent in this case so far as affected by intoxication alone, is one, rather of the exercise of the will, than of the reasoning powers. If the prisoner had the capacity to form the simple intent to kill by the means used, this is sufficient; and his voluntary intoxication will be no protection, though his mental faculties were so far obscured that he was incapable of judging of the right or wrong of his actions. If his mental faculties were so far overcome by the intoxication that he was not conscious of what he was doing, or if he knew what he was doing, but did not know why he was doing it, nor that his acts and the means he was using were naturally adapted to produce death; then he had not the capacity to entertain the intent, and in such case the intent could not be inferred from his acts. But if he knew what

19 MICH.—Y².

he was doing, why he was doing it, and that his acts, with the means he was using, were likely to kill; then he is responsible for the intent as well as the acts, to the same extent, and the jury may infer the intent from his acts in the same manner, as if he were sober. Nor will insanity excuse, if occasioned by voluntary intoxication, and he is aware of his liability to insanity from that cause, and sufficient mental capacity remain to form the intent to kill as above explained.

But if a person be subject to a tendency to insanity of which he is ignorant, which is liable to be excited by intoxication, and if in consequence of intoxication, though voluntary, his mental faculties become excited to diseased action to such an extent that he does not know what he is doing nor why he is doing it; or, if conscious of this, he is not conscious of any object in doing it, or if he does not know that what he is doing or the means he is using are adapted or likely to kill; or, though conscious of all these, yet if the diseased action of his mind has so far overcome or perverted his reason that he does not know that what he is doing is wrong, then he will not be responsible for the intoxication nor its consequences.

*Heard October 15.    Decided January 5.*

Error to Calhoun Circuit.

Information: presented to the Circuit Court for the county of Calhoun by the prosecuting attorney of that county, charging M. Henry Roberts, the plaintiff in error, with an assault upon Charles E. Greble with intent to commit the crime of murder. The defendant was convicted on the trial and the case now comes before this Court upon the bill of exceptions settled and signed by the Circuit Judge.

Upon the trial, to prove the issue on the part of the people evidence was given tending to show that the defendant and one Greble, met in the city of Battle Creek on or about the 10th of March, 1868, between eight and eleven o'clock in the forenoon; that Greble asked defendant when he was going to bring the rest of the wood down; that defendant replied that he had brought all that he was going to, that he had agreed to bring six cords; that Greble replied that only four or four-and-a-half cords had been brought; that defendant said he measured it when he drew it, and if Greble wanted to measure it, he ought to have come and measured it; that Greble said if defendant did not bring the wood he would sue him, but

defendant said he would do nothing about it, and the parties separated :

"That two months prior to this conversation, Greble had sold defendant a cutter, to be paid for, $13 in cash and balance in six cords of wood, to be delivered in Battle Creek; that shortly after the purchase of the cutter the defendant informed Greble that he had got the wood all out and piled on the roadside, and wanted Greble to go up and measure it, as he did not want to re-pile it when it was delivered; that Greble declined to go and measure it saying he would trust the defendant to do so :"

"That on the said 10th day of March, about 1 P. M., the defendant came into Mabley's store at Battle Creek, where Greble was employed as a clerk, and seemed to be angry at Greble; that one J. H. Stone, who was in company with Greble, asked Greble what the trouble was, and was informed by Greble of the conversation in the forenoon; that Roberts then said that Greble had insulted him two or three times about wood and that he wanted him never to speak to him about it again, and if he did, he would be sorry for it, or he would fix him or words to that effect :

"That Greble then told defendant that he was sorry if he had insulted him and asked him when he had done so; that defendant replied that he, Greble, had hallooed at him about the wood, and dunned him in public, and when he did not owe him, and that it was an insult; that Greble informed defendant that he had procured a summons to issue against him for not delivering the balance of the wood :

"That at about six o'clock P. M. on the same day, said Greble was in said store in the act of making change for a customer, when the defendant came into the store in a hurried and excited manner, and walked up to within eight or ten feet of Greble and drew a revolver and fired a shot at him without speaking; that on the firing of the

shot Greble started for the defendant, when he fired a sec-
ond shot, and while in the act of firing the third shot,
Greble seized him, and the load went into the ceiling of
the store, overhead; that the shots were fired rapidly but
none of them took effect; that defendant was immediately
thrown down, disarmed, secured and arrested, when he said
if he had got one more shot he would have fixed him;
that up to the day on which this assault occurred the par-
ties had been on friendly terms:

" That between the second interview between Greble
and the defendant and the assault, the defendant com-
plained of the insult and made threats against Greble and
against the store, saying he would clean out the shanty :

" That the defendant, immediately after his arrest, was
taken to prison by one Pettee, who stayed with him until
morning; that on being put into prison, he fell into a deep
sleep, from which Pettee was unable to arouse him until
about one o'clock, when efforts to arouse him were success-
ful, and from that time to three o'clock, it was impossible
to say whether he was in possession of his mental facul-
ties; but, that at three o'clock he was in possession of
them; but that prior to that time, he did not seem to be
in full possession of his mental faculties:

" That on being asked if he knew what he was in pri-
son for, or what he had been doing, he replied with appar-
ent truth that he did not:

" That he was told by his attendant, Pettee, that he was
there for shooting a man, and asked if he knew who it
was, and after thinking a few minutes he said he did not,
and that he could not think of any one unless it was
Greble, he was then informed that he had hit upon the
right man; defendant then said that Greble had insulted
him and that he first thought he would go home, but he
got to drinking and then he thought he would send to
Chicago and get a man to come and whip him, but after
that he could not remember anything."

ROBERTS *v.* THE PEOPLE.

The people then rested and the defendant "gave evidence tending to show, that the mother of the defendant was living, and was insane with lucid intervals, and has been so for five years last past, and is now 56 years of age:

"That in her lucid intervals she was a kind and quiet woman, but that paroxysms of insanity were brought on by any excitement, and that she was then very violent toward her family and friends, and that defendant's maternal grandfather had died insane:

"That prior to and since said assault he had borne a good character."

And the defendant further "gave evidence tending to show that on one occasion when two ordinary doses or drinks of whisky were administered to him for neuralgia, he was thereby deprived of the use of his mental faculties, and became ungovernable, and insisted that he must go to New York immediately, where he had formerly lived, although he had not contemplated going there before he took the whisky:

"That at the time of firing said shots the defendant was not in possession of his mental faculties, and did not know what he was doing, and that he was in this mental condition from some hours previous to the assault until three o'clock the next morning:

"That the disease of insanity was hereditary, and that in families where it was hereditary it might lie dormant in an individual member of the family for years and then manifest itself; and that intoxicating drinks and exciting altercations were prominent and usual causes of its development, and that it was more likely to be hereditary in the maternal than the paternal side."

After the defendant had rested the said People further, by the way of rebutting the defense "gave evidence tending to show that the defendant was deprived of the use of

his mental faculties at and before and after the assault by his own voluntary intoxication."

The cause was then argued to the Court and jury and the said defendant, by his counsel, requested the Circuit Judge to charge the jury as follows :

1. "If the jury find that the defendant, at the time of the assault, had, by drinking intoxicating liquors, made himself incapable mentally of entertaining the intent to kill, then he is not guilty unless he had formed the intent to kill when mentally capable of entertaining it.

" 2. In this case the act of shooting is an innocent act, unless done with a corrupt and malicious motive, and in such a case the jury may persume that from intoxication there was a want of criminal intent. The question is, did he know what he was about ? The law depends on the answer to this question. If he did, he is guilty. If he did not, he is not guilty.

" 3. The nature and essence of the crime charged in the cause depends upon the particular state and condition of the defendant's mind at the time of the assault, and drunkenness, as a matter of fact, effecting such state and condition of the mind, is a proper subject for consideration and inquiry by the jury. The question is, what was the mental status.

" 4. In order to convict, the jury must find either that the defendant was in possession of his mental faculties and entertained an intent to kill when the assault was made, or that he had formed this intent before he lost control of his faculties.

" 5. When a man becomes voluntarily drunk, there is a wrongful intent, and if, while too far gone to have any further intent he does a wrongful act, the intent to drink coalesces with the act done while drunk, and for this combination of act and intent he is criminally liable. The application of this rule to the case on hand would be that

the drunkenness is no excuse for the assault, but if defendant is charged with a criminal intent accompanying the assault, this could not exist if he was too drunk to entertain it. The wrongful intent in drinking does not supply or aid the proof of an intent to kill.

"6. That if the jury shall find from the evidence that the respondent was afflicted with an hereditary predisposition to insanity, which was aroused and called into action by the stimulus he drank, so that he was at the time of the assault temporarily insane, as contra-distinguished from the ordinary effect of drunkenness, then he was excusable in law from any criminal intent to commit the crime charged."

But the Circuit Judge refused to so charge as to each of said requests; to which refusal the defendant excepted.

The Judge then instructed said jury as follows:

"Should you find the fact to be that the defendant made the assault alleged in the manner and with the instrument as charged in the information, and with the provocation only of the words shown to have been used by the party assaulted, the case of the prosecution is sustained, and the defendant must be found guilty, unless you should find it clearly proved on the other hand, that the defendant at the time of the assault was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong.

"I instruct you further, that voluntary intoxication of the defendant at the time of the assault, will not excuse him and if the defendant was intoxicated at the time, there is no proof that he became so except by his own volition.

"It is claimed by the defense, however, that although intoxication will not excuse the act of the party, it takes

away the element of specific intent, that the assault was an innocent act, unless done with a corrupt or malicious motive, and that in such case the jury may presume that from intoxication there was a want of criminal intent.

" It seems to the Court that the statement here made of the position of the defense, which is believed to be accurate and comprehensive, contains its refutation.

" In what sense could the assault with a deadly weapon be considered innocent? Does not the very act, with its circumstances, carry proof of intention which is irresistible ?

" The power and direction which bore the respondent to the place where Greble was to be found, and identified him there, and which aimed the pistol, fired it, and repeated the discharge, carried with it to other minds the inference of intention, which it seems to me, cannot be questioned either in reason or law."

To each of which charges and instructions the said defendant excepted.

*D. D. Hughes,* for plaintiff in error.

The charge in this case is assault with intent to murder.

I. To constitute this crime there must be a specific intent to murder.—*Maher v. The People, 10 Mich., 217.* Mr. Bishop says in these cases the particular or ulterior intent must be proved, in addition to the more general one, in order to make out the offense, and nothing will answer as a substitute. This being the law, the Court below erroneously refused to instruct the jury on several points.

It is not claimed by us that drunkenness is an excuse for the commission of crime. We accord fully with the doctrine of this Court on that subject in the case of *The People v. Garbutt, 17 Mich., 9.*

But what I contend for, is, that a man who is voluntarily intoxicated, as well as one who is sober, is not responsible for what he has not done, and ought not to be punished for it.

ROBERTS v. THE PEOPLE.

If defendant in this case committed acts which amounted to an assault, or an assault and battery, he could be legally convicted of that, but when he is charged with committing that assault with a specific intent, I insist that such intent must be proved; and if from voluntary intoxication he was incapable of entertaining that intent, and never did entertain it, even in his sober moments, then the offense is not complete, and the refusal of the Court to charge the first request was erroneous.—*1 Bishop's Cr. Law, 299.*

It is no answer to this position to say that if the shot had produced death it would have been murder. This may be so and would be the legitimate result of what I concede, that drunkenness would not excuse an act done.

To constitute murder there need be no specific intent to kill.—*1 Bishop's Cr. Law, 300,* but to constitute an assault, with intent to murder, the specific intent must exist and be proved, and if from any case it is absent and does not form an element in the assault, the defendant is not guilty of the intent.

II. The Court below erred in refusing the second request to charge:—That the shooting was an innocent act unless done with a corrupt motive, and that the jury might presume from intoxication that there was a want of criminal intent. This request is copied from a charge of Judge Baldwin, in *United States v. Roudenbush, 1 Bald., 514,—1 Bishop's Cr. Law, 299 n. 5.* It is substantially like the first request and depends mainly upon the same principle and in refusing it the Court below argued the facts instead of the law.

III. The third request to charge refused by the Court is taken verbatim from the charge of the Court in *Swan v. The State, 4 Humphrey, 136* and is approved by Mr. Bishop.—*1 Bishop's Cr. Law, 299 ; Kelley v. State, 3 Sm. and M. 518 ; Reg. v. Cruse, 8 Car. and P. 541 ; Haile v.*

19 MICH—z.[2]

*The State, 11 Humph. 154; Pirtle v. State, 9 Humph. 663; Reg. v. Moore, 3 Car. and K. 319.*

IV. The fourth request is substantially embodied in the others.

V. This charge was refused on account of the manner of the application of the doctrine to the case, and has already been argued. My application is that drunkenness does not excuse what he does, but does excuse what he don't do, form the intent to kill.

VI. The sixth request to charge which was refused by the Court below, raises a distinct question as to whether hereditary insanity aroused by drinking is an excuse for crime, when the gist of the crime consists of a felonious intent.

VII. The charge which the Court gave to the jury is open to criticism on the points referred to above, and particularly for a discussion of the facts in the case, which it is submitted, is the business of counsel and not of the Court.

*Dwight May*, Attorney General, and *J. G. Lodge*, for defendant in error.

The requests and exceptions seem to be placed mainly upon the ground, that in a case of this kind, intoxication or drunkenness is a good defense, unless the intent to murder had been formed, when the accused was not under the influence of intoxicating liquors. This position cannot be maintained for several reasons.

I. Voluntary intoxication is esteemed by our jurisprudence as *malum in se.—1 Bishop C. L., 488, 496, 414, 415.*—And where a man intending one wrong, which is *malum in se*, does another unintentionally, the intention and the act coalesce; and he is punishable for what he does. Nor need the thing intended be indictable, provided the thing done is so. Hence, when a man voluntarily becomes drunk, there is the wrongful intent; and if, while

too far gone to have any other intent, he does a wrongful act, the intent to drink coalesces with the act done while drunk; and for this combination of act and intent, he is criminally liable.—*1 Bishop C. L., 489, 411, Note (1), 412 and Notes, 415, 3d Ed.; Commonwealth v. Call, 21 Pick., 515; Reg. v. Camplain, 1 Car. & K., 746; State v. Ruhl, 8 Iowa, 447; People v. Enoch, 13 Wend., 159; 1 East, P. C., 255.*— It is, therefore, a legal doctrine, that *voluntary* intoxication furnishes no excuse for crime committed while under its influence.—*The People v. Garbutt, 17 Mich. 19; State v. Bullock, 13 Ala. 413; Beverly's Case, 4 Co., 123 b, 125 a; People v. Pine, 2 Barb. 566, 570; Pleas of the Crown, 1 Hales, 32; Rex v. Thomas, 7 C. & P. 820; 3 Greenleaf Ev., 148; 1 Whart. C. L.,* § *37; U. S. v. Drew, 5 Mason, 29 and 30; Commonwealth v. Hawkins, 3 Gray, 463; People v. Hammill, 2 Parker 223; Rex v. Meakin, 7 C. & P. 297; Rex v. Meakin, 7 C. & P. 145; Bishop C. L., 498, 3d Ed. and Note (2.)*

II. The qualification of the above doctrine, is where the defendant is made drunk by stratagem—the fraud of another, or the unskillfulness of his physician—then he is not responsible.—*Pearson's Case, 2 Lewin, 7, 8; 1 Russ. on Crimes, 7, 8; 1 Hale P. C. 32; People v. Robinson, 2 Parker, 235; 1 Bishop C. L., 3d Ed., 489.* And the exceptions to it arise out of those offenses which, from their peculiar nature, can only be committed when the act is joined to a *particular* intent. These offenses are Larceny, Passing counterfeit money, Murder in the first degree, and possibly some others. To commit these crimes, there is required a peculiar knowledge, nice discrimination and judgment, deliberation and premeditation.—*Nichols v. The State, 8 Ohio State, 435; Rex v. Pitman 2 Car. & P., 423; Commonwealth v. French, Thacher's Crim. Cases, 163; Pigman v. The State, 14 Ohio, 555; U. S. v. Roudenbush, 1 Bald. 514, 517; 1 Bish. C. L., 3d Ed., 490.*

III. But this is not one of the cases coming within the above exceptions. It has been decided in this State that on an indictment for an assault with intent to commit the crime of murder, it is wholly immaterial whether the murder intended would, if consummated, have been murder of the first or second degree.—*People v. Scott, 6 Mich., 287.*

Murder, under our statute, is divided into two degrees The first degree requires a premeditation and determination that the second degree of Murder does not; but both degrees are *murder.* And murder under our statute embraces every offense which would have been murder at the common law, and it embraces no other crimes. Murder at the common law embraces all unlawful killing done with *malice* aforethought.—*People v. Scott. 6 Mich., 292, 296.* And the doctrine of the courts is that the intention to drink may fully supply the place of malice aforethought. So that if one voluntarily becomes so drunk as not to know what he is about, and then with a deadly weapon kills another, the killing will be murder, the same as if he were sober. In other words, the mere fact of drunkenness will not, alone, reduce to manslaughter a homicide which would otherwise be murder; much less extract from it altogether its indictable quality. If so, a drunken man could not commit the crime of assault with intent to murder.—*1 Bishop Crim. Law, 3d Ed., 491; Beverly's Case, 4 Co. 123 ; U. S. v. Cornell, 2 Mason, 91, 111; Haile v. The State, 11 Humph. 154 ; Pirtle v. The State, 9 Humph. 663 ; Commonwealth v. Hawkins, 3 Grey, 463 ; People v. Hammill, 2 Parker, 223 ; People v. Filler, 2 Parker, 16 ; People v. Robinson, 1 Parker, 649; Pennsylvania v. McFall, Addison, 255, 257 ; Rex v. Meakin, 7 C. & P. 297 ; Rex v. Carroll, 7 C. & P. 145 ; People v. Garbutt, 17 Mich. 19.*

IV. Voluntary drunkenness is no excuse for crime, and a man is held to the same responsibility for his criminal

acts while drunk, the same as if he were sober and sane. A sane man is presumed to contemplate the natural and probable *consequences* of his own acts; and therefore the intent to murder is conclusively inferred from the deliberate use of a deadly weapon. It is not an innocent act to assault another with a dangerous or deadly weapon, whether the assaulter be drunk or sober.—*1 Gr. Ev. Sec. 18 ; 1 Russ. on Crimes, 658 ; Rex v. Dixon, 3 M. & S., 15 ; 1 Hale's P. C. 440, 441; Rex v. Meakin, 7 C. & P. 297 ; Rex v. Carroll, 7 C. & P. 145 ; 1 Bishop C. L. 3d Ed. 710, 712, 716 ; State v. Smith, 2 Strob. 77 ; Rex v. Thomas, 7 C. & P. 817; State v. Furgerson, 2 Hill ( S. C. ) 619 ; U. S. v. Willberger, 3 Wash. C. C. 515 ; State v. Sisson, 3 Brev. 58.*

And whenever an assault with intent to murder is committed, and the circumstances are such that if death had ensued, the killing would have constituted murder at the common law, the offense of assault with intent to murder under the statute, is complete.—*People v. Scott, 6 Mich., 287.*

V. The sixth request of the defendant is objectionable.

(*a*) Where a person is predisposed to insanity, and by his own voluntary act makes himself temporarily insane, or voluntarily arouses the insanity to which he is predisposed, and while in such condition commits crime, he cannot claim exemption from punishment for the crime so committed, by pleading his own wrong—voluntarily using intoxicating liquors, and making himself drunk—insane.

(*b*) Again, the request to charge is objectionable, on the ground of impracticability. All drunkenness is temporary insanity; and it manifests itself in as many different ways as there are different individuals who become drunk. And it is impossible for a jury to say of a drunken man whether he was temporarily insane from drunkenness, or from a predisposition to insanity, when, as a matter of fact, he was drunk at the time of the commission of the crime; as the facts in this case, the requests to charge, and the charge

of the Court, all show that defendant was under the influence of intoxicating liquors when the assault was committed.—*1. Whart. C. L., 5th Ed., Sec. 37 and notes.*

VI.   The charge of the Court in this case was correct, as a reference to the facts will show. It has been held by this Court, where the charge of the Judge, to which exception is taken, was not strictly correct, but the Court can clearly see that the jury could not have been misled by it to the injury of the party excepting, a new trial will not be granted for that error.—*People v. Scott, 6 Mich., 287.*

CHRISTIANCY J.

The defendant was tried in the Circuit Court for the County of Calhoun, upon an information charging him with assaulting, with intent to murder, one Charles E. Greble, by shooting at him with a loaded pistol.

Exceptions were taken to the refusal of several requests to charge, and to the charge given. To take up the several exceptions separately, many of which embrace similar propositions in different forms, would lead to prolixity and be less intelligible, than to consider the several questions really raised by the exceptions. And as the bill of exceptions, including the evidence, will accompany the report, it is unnecessary to repeat them here.

The first question · presented by the record is, whether, under this information, the jury could properly find the defendant guilty of the assault *with the intent charged*, without finding, as matter of fact, that the defendant entertained that particular intent?

We think the general rule is well settled, to which there are few, if any exceptions, that when a statute makes an offense to consist of an act combined with a particular intent, that intent is just as necessary to be proved as the act itself, and must be found by the jury, as matter of fact, before a conviction can be had.   But especially, when the

offense created by the statute, consisting of the act and the intent, constitutes, as in the present case, substantially an attempt to commit some higher offense, than that which the defendant has succeeded in accomplishing by it; we are aware of no well founded exceptions to the rule above stated. And in all such cases the particular intent charged must be proved to the satisfaction of the jury; and no intent in law, or mere legal presumption, differing from the intent in fact, can be allowed to supply the place of the latter.—*Rex. v. Thomas, 1 East P. C. 417 ; 1 Leach, 330 ; Rex v. Holt, 7 Car. and P. 518 ; Cruse's case, 8 Car. and P. 541; Reg. v. Jones, 9 Id. 258 ; Regina v. Ryan, 2 Mood. and R. 213 ; Rex v. Duffin, Russ. and Ry. 364; Ogletree v. The State, 28 Ala. 693 ; Maher v. The People, 10 Mich. 212; People v. Scott, 6 Mich, 296, (per Campbell J.) ; Roscoe Cr. Ev. 775, 790 ; 1 Bish. Cr. L. §§ 666, 667.*

This case, so far as regards the intention to kill, is not identical with that of murder. To find the defendant guilty of the whole charge, it is true, the jury must find the intent to kill under circumstances which would have made the killing murder—and it is not denied that had death ensued in the present case, it would have been murder. But the converse of the proposition does not necessarily follow; that, because the killing would have been murder, therefore there must have been an intention to kill. Murder may be and often is committed without any specific or actual intention to kill. See instances stated in *1 Bish. Cr. Law. sec. 412 and 667.* And no such specific intent is therefore necessary to be found. This difference was recognized in *Maher v. The People,* above cited.

By saying however that the specific intent to murder, or, (which under the circumstances of the case would be the same thing), the intent to kill, must be proved, we do not intend to say it must be proved by direct, positive, or independent evidence; but as very properly remarked by my

brother Campbell in *People v. Scott, 6 Mich., 266,* the jury "may draw the inference, as they draw all other inferences, from any facts in evidence which, to their minds, fairly prove its existence." And in considering the question they may and should take into consideration the nature of the defendant's acts constituting the assault ; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations, prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made.

The principle we have thus endeavored to explain seems to have been overlooked by the Court. And, taking the whole charge, (given in the record), together, we think the jury were in effect told, that if they should find the defendant made the assault alleged, in the manner and with the instrument charged in the information, the law inferred the intent charged, and they were at liberty to find the defendant guilty, whether they were satisfied of the intent or not, as a matter of fact—unless they should find "that the defendant was laboring under such a defect of reason from disease of the mind, as not to know the nature and quality 'of the act he was doing, or if he did know it, that he did not know what he was doing was wrong."

The second question raised by the exceptions, is whether the voluntary drunkenness of the defendant, immediately prior to and at the time of the assault, to a degree that would render him incapable of entertaining, in fact, the intent charged, would constitute a valid defense, so far as related to the intent, and leave the defendant liable only for what he actually did—the assault, without the aggravation of the intent.

It was very properly admitted by the defendant's counsel in his request to charge, that if the defendant had formed the intent, while in possession of his mental faculties

and entertained it before and at the time he became intox-icated, his subsequent voluntary intoxication to whatever extent, would not shield him from a conviction of the offense charged, including the intent, nor even for murder had death ensued from the assault. And the principle laid down by Mr. Bishop in his work on criminal law, (*vol. 1 sec. 489*) was also expressly admitted, that "when a man voluntarily becomes drunk, there is a wrongful intent; and if, while too far gone to have any further intent, he does a wrongful act, the intent to drink coalesces with the act done while drunk, and for this combination of act and intent, he is criminally liable." But it was insisted that the application of this rule to this case would be that the drunkenness is no excuse for the assault, but being charged with the particular intent accompanying the assault, *this* could not exist if he was too drunk to entertain it. That the wrongful intent in drinking does not supply or aid the proof of an intent to kill.

The correctness of the principle laid down by this Court in *People v. Garbutt,* (*17 Mich. 9–19,*) is not denied; that "a man who voluntarily puts himself into a condition to have no control of his actions, must be held to intend the consequences." But this, it is insisted, includes only the consequences which do actually ensue—the crime actually committed; and not in this case, the intent charged, if the defendant was at the time incapable of entertaining it, and did not in fact entertain it.

We think this reasoning is entirely sound, and it is well supported by authority. See *Reg. v. Cruse 8 Car. and P. 541; Reg. v. Moore 3 Car. and K. 319; Pigman v. The State, 14 Ohio 555; United States v. Roudenbush 1 Bald., 514; Pirtle v. The State, 9 Humph. 663; Haile v. The State, 11 Humph. 154; Swan v. The State, 4 Id. 136; Mooney v. The State, 33 Ala. 419; Kelly v. The State, 3 S. & M. 518; People v. Robinson, 2 Park. 235; People v. Hammill, 2 Id. 223; Keenan v. Com., 8 Wright, (Pa.)*

*55 ; People v. Belencia, 21 Cal. 544 ; and see 1 Bish. Cr. L. secs 490, 492.*

In determining the question whether the assault was committed with the intent charged, it was therefore material to inquire whether the defendant's mental faculties were so far overcome by the effect of intoxication, as to render him incapable of entertaining the intent. And for this purpose, it was the right and . duty of the jury—as upon the question of intent of which this forms a part—to take into consideration the nature and circumstances of the assault, the actions, conduct and demeanor of the defendant, and his declaration before, at the time, and after the assault ; and especially to consider the nature of the intent and what degree of mental capacity was necessary to enable him to entertain the simple intent to kill, under the circumstances of this case—or, which is the same thing, how far the mental faculties must be obscured by intoxication to render him incapable of entertaining that particular intent. This last question involves, as I think, in connection with the evidence, a principle of law which I shall presently notice. Some intents, such as that to defraud, when the result intended is more indirect and remote, or only to be brought about by a series or combination of causes and effects, would naturally involve a greater number of ideas, and require a more complicated mental process, than the simple intent to kill by the discharge of a loaded pistol. The question we are now considering relates solely to the capacity of the defendant to entertain this particular intent. It is a question rather of the exercise of the will than of reasoning powers. And as a matter of law, I think the jury should have been instructed, that if his mental faculties were so far overcome by the intoxication, that he was not conscious of what he was doing, or if he did know what he was doing, but did not know why was doing it, or that his actions and the means he was using were naturally adapted or calculated to endanger

life or produce death ; then he had not sufficient capacity to entertain the intent, and in that event they could not infer that intent from his acts. But if he knew what he was doing, why he was doing it, and that his actions with the means he was using were naturally adapted or likely to kill, then the intent to kill should be inferred from his acts in the same manner and to the same extent as if he was sober. But that on the other hand, to be capable of entertaining the intent, it was not necessary that he should so far have the possession of his mental faculties as to be capable of appreciating the moral qualities of his actions, or of any intended result, as being right or wrong. He must be presumed to have intended the obscuration and perversion of his faculties which followed from his voluntary intoxication. He must be held to have purposely blinded his moral perceptions, and set his will free from the control of reason— to have suppressed the guards and invited the mutiny; and should therefore be held responsible as well for the vicious excesses of the will, thus set free, as for the acts done by its prompting. There is no ground upon which a distinction can safely be made in such cases, between the acts of his hands and those of his will, which have set in motion and directed the hands. He must therefore be held equally responsible for the will or intention, as for the act resulting from it.

But he is not to be held responsible for the intent, if he was too drunk for a conscious exercise of the will to the particular end, or, in other words, too drunk to entertain the intent, and did not entertain it in fact. If he did entertain it in fact, though but for the intoxication he would not have done so, he is responsible for the intent as well as the acts.

When the question is one rather of guilty knowledge than of a particular intent, (as in *U. S. v. Roudenbush and Pigman v. The State*, above cited), there may be more rea-

son for holding that a defendant in such cases should be capable of appreciating the moral quality of his actions to render him responsible; and so, possibly when the act done is innocent in itself, or only becomes at all criminal by reason of the particular intent charged; upon such cases I express no opinion. But where, as in this case, the act committed is itself criminal without the particular intent, and especially when the manner in which the act was committed and the means and instruments used are naturally and obviously adapted to produce death, and dangerous to others, whether he intended to kill or not; a rule which should hold him incapable of entertaining the intent unless he was at the same time cognizant of the moral quality of his actions, would be just as dangerous, as if the same rule was applied to *acts* committed under the influence of intoxication and would practically render intoxication a substantial protection to crime.

But the Circuit Court held, in effect, that no extent of intoxication could have the effect to disprove the intent; treating the intent as an inference of law for the Court, rather than a question of fact for the jury. In this we think there was error.

Thus far we have considered the question of intent, as affected by the voluntary intoxication alone. But the question of insanity, as affecting the intent, was also raised. And this upon the evidence is proper to be considered under three aspects.

There was evidence tending to show that the mother of the defendant, who was living, was insane with lucid intervals, and had been so for the preceding five years. That in her lucid intervals she was a kind and quiet woman, but that paroxysms of insanity were brought on by any excitement, and that she was then very violent towards her family and friends, and that defendant's maternal grandfather had died insane. There was also evidence tending to

show that the disease of insanity was hereditary, and that in families where it was hereditary, it might lie dormant in the individual member of the family for years, and then manifest itself; and that intoxicating drinks and exciting altercations were prominent and usual causes of its development, and that it was more likely to be hereditary on the maternal than paternal side.

But there was no evidence tending to prove, that the defendant himself had ever previously exhibited any indication or symptoms of insanity, except what might or might not be inferred from the effects produced upon him on a single occasion by intoxication, or the drinking of intoxicating liquors, when two ordinary doses or drinks of whisky had been administered to him for neuralgia, by which he was deprived of the use of his mental faculties and became ungovernable, insisting that he must go to the State of New York immediately, where he had formerly lived, although he had not contemplated going there before he took the whisky.

Nor was there any evidence tending to show any form or degree of insanity, distinct from and independent of the effects of intoxication, on the day of, or after, the assault, unless the high degree of excitement and vindictiveness aroused by the verbal altercation with Greble before the intoxication, can be considered as such evidence. But if the manifestations of mental disturbance from drinking the whisky on a former occasion alluded to, can be considered as tending to show anything more than the effects of intoxication upon a sane mind somewhat easily affected, in one, among the almost infinite varieties, of form in which those effects exhibit themselves in men of different mental and physical organizations, whose minds are otherwise sane, — if it can be considered as tending to show that, above and beyond the effects of intoxication upon a sane mind, a dormant tendency to insanity had been aroused into action, it would still tend, in this

case, only to show—not the effect of insanity *alone*, as *inde-pendent* of or *contra-distinquished* from intoxication, but the effect of some unknown degree of insanity, *combined with* and *produced by the intoxication* and disappearing with it, and which, *but for that intoxication would not have occurred.*

If, therefore, the intoxication was voluntary on his part—as all the evidence tended to show unless he had become in-sane before he resorted to drinking, as presently explained—any degree of insanity thus produced would be a part of the consequences of such voluntary intoxication. And if, from his past experience or information, he had, while sane and before drinking, on that day, good reason to believe that, owing to a dormant tendency to insanity, intoxication would be likely to produce an extraordinary degree of mental derangement beyond the effects likely to be pro-duced upon persons clear of any such tendency, he must be held to have intended this extraordinary derangement as well as the intoxication and the other results produced by it. And the same degree of mental incompetency would be required to render him incapable of entertaining the intent, whether caused by the intoxication combined with the in-sanity thus produced, or by the intoxication alone. And the same principle already laid down in reference to the ques-tion of capacity, as affected by intoxication alone, would apply with equal force to this aspect of the case.

But if he was ignorant that he had any such tendency to insanity, and had no reason from his past experience, or from information derived from others, to believe that such extraordinary effects were likely to result from the intoxi-cation; then he ought not to be held responsible for such extraordinary effects; and so far as the jury should believe that his actions resulted from these, and not from the nat-ural effects of drunkenness, or from previously formed inten-tions; the same degree of competency should be required to render him capable of entertaining, or responsible for,

the intent, as when the question is one of insanity alone, which I now proceed to consider.

If it should be found from the evidence that the defendant inherited a peculiar tendency to insanity, which was liable to be aroused by slight causes, and that in consequence of this, and before he resorted to drinking on that day, the verbal altercation he had with Greble in the forenoon had aroused this diseased action of his mental faculties, to such an extent that he did not know what he was doing; or, if conscious of this, he yet was not conscious of any object in doing it; or, if he did not know that what he was doing, or the means he was using were adapted, or likely to kill; or, though conscious of all these, yet if the diseased action of his mind had so far overcome or perverted his reason that he did not know that what he was doing was wrong; then he was not responsible either for the intoxication, or its consequences. And if he continued thus incapable up to the time of the assault, either from this cause alone or combined with the supervening intoxication, he was neither morally nor criminally responsible for his acts or intentions.

A new trial must be awarded.

The other Justices concurred.