# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

STEVEN LEE KRYGOWSKI,

        Defendant-Appellant.

UNPUBLISHED
July 21, 2016

No. 327420
Jackson Circuit Court
LC No. 13-003522-FC

Before: STEPHENS, P.J., and SERVITTO and GLEICHER, JJ.

PER CURIAM.

A jury convicted defendant of assault with intent to murder, MCL 750.83, assault with intent to rob while armed, MCL 750.89, first-degree home invasion, MCL 750.110a(2), and assault with a dangerous weapon (felonious assault), MCL 750.82, for the brutal beating of his 69-year-old, disabled neighbor. Defendant raises myriad challenges to his convictions and sentences. We acknowledge an evidentiary error but find it harmless. Defendant's sentencing complaints have merit, however, and require resentencing. We therefore affirm defendant's convictions, but vacate his sentences and remand for further proceedings.

## I. BACKGROUND

Defendant worked as a maintenance man and serviced a home that was divided into apartments in Jackson. He lived next door to this building and was well known to its residents—John Bickel, Christine Horst, and Tilghman Crawley.

In the early morning hours of November 21, 2013, someone broke into Bickel's apartment. Bickel was a week short of his 70th birthday and relied on a wheelchair for mobility. He recounted that he awoke to find defendant, whom he knew by name, standing over his bed. Defendant demanded money. When Bickel refused, defendant beat him about the head and face with a baseball bat.

Horst heard the fray through the home's air vents. She heard Bickel scream, "stop hitting me," and heard defendant, whose voice she recognized, demand money. Horst also picked up the "whapping" sounds of the physical assault. Horst called out to her boyfriend, Crawley, who corroborated Horst's description of the sounds. Horst telephoned 911 while Crawley went outside and unsuccessfully tried to force his way into Bickel's apartment. Crawley eventually saw defendant walking down Bickel's exterior wheelchair ramp, carrying a baseball bat.

-1-

Crawley asked defendant what he was doing and defendant instructed him to "mind [his] own damn business." Defendant then entered his nearby apartment.

When police arrived at the scene they found a bloody bat outside the home and Bickel in his bed, covered in blood. Later that morning Bickel was flown to the University of Michigan Hospital with life-threatening skull and facial injuries. Bickel's right eyeball literally "was broken" rendering him blind on that side, and he lost several teeth. Subsequent tests matched the blood on the bat with Bickel.

Based on Bickel's and Crawley's identification of defendant as the assailant, the police secured a warrant for defendant's arrests. They found him in his apartment, intoxicated and asleep. Defendant steadfastly denied any role in Bickel's beating. Nonetheless, the jury convicted him as charged.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant contends that the prosecution presented insufficient evidence to support his intent in relation to the assault with intent to murder conviction. We review challenges to the sufficiency of the evidence de novo, viewing the evidence "in the light most favorable to the prosecution" to determine whether a rational trier of fact "could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Odom*, 276 Mich App 407, 418; 740 NW2d 557 (2007). "Conflicts in the evidence must be resolved in favor of the prosecution," and "[c]ircumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "Special deference is given to a trial court's findings when based on witness credibility." *People v Sherman-Huffman*, 241 Mich App 264, 267; 615 NW2d 776 (2000).

To establish a charge of assault with intent to murder, the prosecution must prove beyond a reasonable doubt that (1) an assault occurred, (2) the defendant bore an actual intent to kill, and (3) if the victim died, it would be deemed a murder. *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999). Contrary to defendant's appellate claims, neither premeditation nor deliberation are elements of this offense.

" 'Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient.' " *People v Ericksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010), quoting *McRunnels*, 237 Mich App at 181. A defendant's intent to kill can be inferred from "[t]he severity and vastness of the victim's injuries." *People v Mills*, 450 Mich 61, 71; 537 NW2d 909 (1995). As described in *People v Taylor*, 422 Mich 554, 568; 375 NW2d 1 (1985), quoting *Roberts v People*, 19 Mich 401, 416 (1870):

> "[T]he jury 'may draw the inference, as they draw all other inferences, from any facts in evidence which to their minds fairly prove its existence.' And in considering the question they may, and should take into consideration the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior

to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made."

Here, Bickel testified that defendant beat him repeatedly about the face and head with a baseball bat. Dr. Paul Kloostra, the maxillofacial surgeon who treated Bickel at the University of Michigan, testified that Bickel's injuries were critical and life-threatening. Bickel suffered at least 10 fractures, including a broken nose, forehead lacerations, a fracture in his sinus tunnel, several fractures and injuries to his orbital sockets and several skull fractures, as well as bleeding inside his brain. Four to six of Bickel's teeth had to be removed. Bickel's "broken" eyeball was saved for cosmetic purposes only. The level of force necessary to inflict these injuries, in conjunction with the use of a heavy bat, was more than sufficient to establish defendant's intent to kill beyond a reasonable doubt.

## III. OTHER ACTS EVIDENCE

Defendant correctly posits that the court erred by admitting other acts evidence under MRE 404(b). We review for an abuse of discretion a trial court's decision to admit evidence over a party's objection. *People v Dobek*, 274 Mich App 58, 84-85; 732 NW2d 546 (2007). "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

MRE 404(b)(1) governs the admission of other acts evidence, and provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

When reviewing whether evidence was properly admitted under MRE 404(b), we must consider (1) whether the evidence was "offered for a proper purpose under Rule 404(b)"; (2) whether the evidence was "relevant under Rule 402 as enforced through Rule 104(b)"; (3) whether the evidence's probative value was substantially outweighed by unfair prejudice as provided in MRE 403; and (4) whether the trial court provided "a limiting instruction to the jury." *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). "At its essence, MRE 404(b) is a rule of inclusion, allowing relevant other acts evidence as long as it is not being admitted solely to demonstrate criminal propensity." *People v Martzke*, 251 Mich App 282, 289; 651 NW2d 490 (2002).

MRE 402 provides that "[a]ll relevant evidence is admissible. . . . Evidence which is not relevant is not admissible." " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Logical relevancy can be established by showing similarity between the charged conduct and the defendant's prior act. When the current and past acts are sufficiently similar, admission of other acts evidence can

establish that the defendant had a common plan, scheme or system. See *People v Sabin (After Remand)*, 463 Mich 43, 63-64; 614 NW2d 888 (2000). Contrary to the trial court's musings, the other-act evidence proffered in this case was not sufficiently similar to the current charged conduct to establish a common plan, scheme or system.

The other-acts evidence was presented through the testimony of Amanda Anders and Mark Nichols. They described that approximately a year before the charged incident, defendant was a social guest in their home. When the homeowners decided to retire for the evening, they asked defendant to leave. He complied, but later returned uninvited and intoxicated and propositioned two teenage girls in the home. Anders and Nichols again asked defendant to leave and were forced to "push[] him out the door." During this struggle, defendant punched both Anders and Nichols in the face, knocking them to the ground.

The only similarities between the current and past events were defendant's intoxication and his use of violence against the homeowners. In the earlier incident, defendant came uninvited to an acquaintance's home and requested sexual acts from minors. In the current matter, defendant broke into his neighbor's house while armed with a baseball bat intent on stealing cash. Defendant threw two punches during the earlier incident after being forcibly ejected from a home. This scenario bears no resemblance to a home invasion committed with the intent to rob, and the two punches differ markedly from the violence unleashed by repetitive swings of the baseball bat. Given the lack of any real similarity between the two events, the sole purpose of the other-act evidence was to portray defendant as aggressive and violent. This is precisely the inference forbidden by MRE 404(b). Accordingly, the trial court clearly abused its discretion in admitting it.

Improper admission of evidence under MRE 404(b) does not necessarily warrant relief. Rather, we must determine "after an examination of the entire cause," whether "it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999) (quotation marks and citation omitted). The defendant bears the burden of demonstrating that such error resulted in a miscarriage of justice. *Id*. at 493-494; see also *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Bickel positively identified defendant as his attacker and described the baseball-bat attack. Crawley observed defendant leaving Bickel's apartment carrying a baseball bat and a bloody bat was found outside the rental home. Both Crawley and Horst heard the attack and described that it sounded like "a slab of beef being hit." The jury found this evidence more credible than defendant's account of what occurred that night—that he was in his apartment smoking marijuana and drinking when he saw someone else in the vicinity and merely went to check on Bickel. Given the compelling nature of the evidence against defendant, we cannot find that the improper admission of the other acts-evidence resulted in a miscarriage of justice. Accordingly, defendant is not entitled to relief.

## IV. HEARSAY EVIDENCE

Defendant asserts that the prosecution improperly bolstered the credibility of its witnesses by having them read various hearsay statements into the record. He further contends that his counsel was ineffective for failing to object to the admission of these statements.

During direct examination, Horst described the sounds she heard through the air vents, including that she recognized the assailant's voice as belonging to defendant. At the end of this examination, the prosecutor asked the court if Horst could read her police statement into the record. Defense counsel voiced no objection. Horst read:

> I was sitting in my room watching tv. I can hear Mr. Bickel snoring every night through the vent on the floor in my room. Well I didn't hear him so I was listening. I heard him yelling stop, get out of my damned house. And then I heard another voice tell him to shut the hell up and a sound like a big slab of beef – excuse me, a side of beef being punched. So I called 911, sent . . . Crawley to his – to his apartment to see if he could get – help Mr. Bickel. The cops arrived and that was all.

The prosecutor inquired why Horst did not name defendant in her statement. Horst replied that she was uncertain at the time of the offense of defendant's last name. Defense counsel did not explore this issue during cross examination.

Crawley then testified regarding the noises he heard inside Bickel's apartment and his observation of defendant leaving Bickel's apartment. The prosecutor requested that Crawley read his statement and defense counsel again indicated that he had no objection. Crawley stated:

> Me and my girlfriend was watching a movie. Every night we can hear . . . Bickel snoring and everything and (undecipherable) as usual we did until 2:00 a.m. when I went downstairs. My girlfriend called me up in a panic saying she's hearing something from John's apartment that didn't sound right. I listened, I heard him yelling get off me, stop, you get out of my house. I heard what sounded like a side of beef being hit very hard.

> I ran downstairs to his apartment and tried to open the door. He was yelling for help. I tried to open it but it wouldn't open. I yelled to my girlfriend, call 911. While I was outside waiting for the police I saw Steve leave John's apartment.

The final line of Crawley's written statement actually read, "While I was outside waiting for the police I saw leave John's apartment." The prosecution clarified the correct wording and asked Crawley why he did not name defendant in the statement. Crawley asserted that he had no reason for excluding defendant's name. Defense counsel revisited this issue on cross-examination, clarifying that Crawley's police statement did not name defendant or refer to assailant as "the maintenance man."

The final challenged statement came from Ronald Kemppainen. Kemppainen and defendant were acquainted before the incident in question and reconnected while both awaited

trial in the Jackson County Jail. Kemppainen testified that defendant admitted during their incarceration "that he hit [an old man] in the head with a baseball bat until his eye popped out of his head and just beat the living shit out of him." The prosecution sought to admit two letters that Kemppainen had written to the jail guards during this time period, and defense counsel indicated that he had no objection to the admission of this evidence. Kemppainen read these letters into the record. The first requested a transfer to another portion of the jail because "I'm being strong armed. [Defendant's] attorney is going to subpoena me to court. I want to talk to [defendant's] prosecutor in his case." The second letter reiterated:

> I don't want to testify for the defense and [defendant's] case, but I believe his attorney will call me to testify. I would rather testify for the prosecutors. [Defendant] was more or less strong arming me into testifying. He had concocted a whole story for me to testify to. . . . [Defendant] is going to force . . . me to commit perjury. I don't want to be called to testify for that offense. . . .

Also without objection from defense counsel, the prosecutor presented a note that defendant's cellmate had written to Kemppainen describing the false testimony that defendant expected Kemppainen to provide. Specifically, Kemppainen was to testify that he was with defendant the entire night of the offense, drinking alcohol and smoking marijuana. Defendant asked Kemppainen to corroborate his testimony that an unidentified suspect was loitering outside the rental units.

Generally, we would review a trial court's decision to admit evidence for an abuse of discretion. *People v Waclawski*, 286 Mich App 634, 670, 780 NW2d 321 (2009). However, each time that the prosecution sought to introduce a witness's prior written statement, defense counsel specifically stated that he had "no objection" to its admission. Through this express approval, defendant waived any claim of error related to the admission of the evidence. *People v Fetterley*, 229 Mich App 511, 520; 583 NW2d 199 (1998). This waiver necessarily includes defendant's challenge that the prosecutor engaged in misconduct by presenting the evidence to improperly bolster the credibility of the state's witnesses.

Defendant also challenges defense counsel's performance in allowing these errors to be waived. Defendant preserved this challenge by filing a motion in this Court to remand for a hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). This Court denied the motion because defendant had "not demonstrated that further factual development of the record or an initial ruling by the trial court is necessary at this time in order for this Court to review the issues on appeal." *People v Krygowski*, unpublished order of the Court of Appeals, entered December 18, 2015 (Docket No. 327420). Accordingly, our review is limited to mistakes apparent on the existing record. See *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

> " '[T]he right to counsel is the right to the effective assistance of counsel.' " *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984), quoting *McMann v Richardson*, 397 US 759, 771 n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970). An ineffective assistance claim includes two components: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance

-6-

prejudiced the defense." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish the deficiency component, a defendant must show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). With respect to the prejudice aspect, the defendant must demonstrate a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. *Id.* at 663-664. The defendant also must overcome the strong presumptions that "counsel's conduct [fell] within the wide range of reasonable professional assistance" and that counsel's actions were sound trial strategy. *Strickland*, 466 US at 689. [*People v Galloway*, 307 Mich App 151, 157-158; 858 NW2d 520 (2014), rev'd in part on other grounds 498 Mich 902; 870 NW2d 893 (2015).]

The evidence presented during Kemppainen's testimony was highly prejudicial. Kemppainen's two notes to jail guards documented that defendant was trying to strong arm him into providing a false alibi and that he was frightened for his safety if he refused. The note instructing Kemppainen regarding his testimony was written by defendant's cellmate, who was not presented as a witness at trial. The details matched defendant's version of events provided on the stand at trial. And Kemppainen denied the accuracy of defendant's story on the stand. A reasonable trial strategy would include an objection to the introduction of these statements.

Kemppainen's notes were inadmissible hearsay pursuant to MRE 801(d)(1). Pursuant to this rule, a witness's prior statement "is not hearsay if":

The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) *consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . .* [Emphasis added.]

Kemppainen testified at trial and was available for cross-examination. The notes were consistent with his trial testimony that defendant attempted to strong arm him into testifying in a certain manner. Although defendant provided a different version of events at trial, he did not accuse Kemppainen "of recent fabrication or improper influence or motive." Accordingly, the notes fell within the definition of hearsay and were inadmissible absent an exception to the hearsay rule. MRE 802. The prosecution makes no attempt on appeal to locate a hearsay exception and instead inaccurately contends that because the notes are contradictory, they could be used to impeach Kemppainen's credibility. We see no contradiction and reject this argument.

However, defendant cannot establish prejudice. Three individuals who were well acquainted with defendant placed him at the scene with a baseball bat. The victim expressly testified that defendant assaulted him. Kemppainen's notes did not impact the outcome of the proceedings.

The note written by defendant's cellmate and describing the testimony Kemppainen should give at trial is a statement by a declarant who was not present in the courtroom. Yet, as it was not presented to prove the truth of the matter asserted, it is not hearsay and counsel had no

reason to object on that ground. MRE 801(c). Defendant posits no other theory on which counsel should have objected to the admission of this evidence. Accordingly, we decline to give this issue further review. See *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001).

Counsel's strategy in permitting the admission of Crawley's and Horst's statements is obvious: neither witness named defendant as the suspect in those written missives. These omissions helped defendant cast doubt on the veracity of the witnesses' accounts, as one would expect them to name the suspect if he was well known to them. Defense counsel emphasized this very point when cross-examining Crawley, and reiterated during closing argument:

> [I]f you look at the documents that have been admitted regarding the statements that they wrote when they first overheard what was transpiring in Mr. Bickel's apartment was they heard a voice. Nowhere did it say that they heard Steve Krygowski, that they both said they know well and have talked to many times, never does it say that they heard the voice of the maintenance man. They heard a voice. It was later as this story evolves that they start connecting dots and think that, "Oh, must have been Steve Krygowski – it was Steve Krygowski," and they get everybody oriented on that way . . . .

That counsel's strategy ultimately was unsuccessful does not render his assistance ineffective. *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001).

## V. IDENTIFICATION PROCEDURE

In a brief filed pursuant to Supreme Court Administrative Order 2004-6, Standard 4, defendant contends that law enforcement used an unreasonably suggestive identification procedure in relation to Bickel. The investigating officer testified that on the night of the incident, Crawley claimed to have seen defendant leaving Bickel's apartment. The officer later travelled to the hospital to interview Bickel. Bickel indicated that "his neighbor" assaulted him. The officer "asked him if he meant the maintenance man Steve, which he stated yes." Defendant contends that this "identification" was tainted because the officer placed defendant before the victim as the suspect, guaranteeing his selection. Contrary to defendant's claim, this was investigation, not "identification." The officer named one of Bickel's neighbors and asked if he was the neighbor in question. No law enforcement officer paraded defendant into Bickel's hospital room. Accordingly, defendant's claim is completely without merit.

## VI. DOUBLE JEOPARDY

Defendant next complains that his three assault convictions violated double jeopardy principles as they all arose from a single attack. As defendant failed to raise this issue below, our review is limited to plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764.

The United States and Michigan Constitutions both protect against double jeopardy. US Const, Am V; Const 1963, art 1, § 15. The double jeopardy provisions afford individuals "three related protections": they protect against (1) "a second prosecution for the same offense after acquittal"; (2) "a second prosecution for the same offense after conviction"; and (3) "multiple punishments for the same offense." *People v Ream*, 481 Mich 223, 227; 750 NW2d 536 (2008),

quoting *People v Nutt*, 469 Mich 565, 574; 677 NW2d 677 (2004). The first two protections are referred to as the "successive prosecutions" strand of double jeopardy, *Nutt*, 469 Mich at 575, while the third comprises the "multiple punishments" strand. *People v Smith*, 478 Mich 292, 299; 733 NW2d 351 (2007). To determine if a defendant's convictions and sentences amount to multiple punishments for a single offense in violation of double jeopardy principles, we rely on the "same-elements test." This test was originally elucidated in *Blockburger v United States*, 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 (1932). Under this test, we compare offenses to determine whether each offense "requires proof of a fact which the other does not." *Smith*, 478 Mich at 305 (citation omitted). If this is true, multiple punishments may be imposed. *Id.* at 316.

Conviction for felonious assault and assault with intent to rob while armed does not violate double jeopardy protections because each offense requires proof of an element that the other does not. Felonious assault requires the use of an actual dangerous weapon, i.e., "a gun, revolver, pistol, knife, iron bar, club, brass knuckles, or other dangerous weapon." MCL 750.82(1). In contrast, assault with intent to rob while armed requires a specific intent to rob or steal, an element not necessary to convict a person of felonious assault. *People v Akins*, 259 Mich App 545, 554; 675 NW2d 863 (2003); MCL 750.89. Although the defendant must be "armed," use of a feigned weapon suffices. See *People v Walls*, 265 Mich App 642, 646; 697 NW2d 535 (2006). To prove a charge of assault with intent to murder, the prosecutor need not present any evidence regarding the use of a weapon, real or implied. Rather, the defendant must bear "an actual intent to kill," *McRunels*, 237 Mich App at 181, which is not an element of felonious assault or assault with intent to rob while armed. As each offense requires proof of distinct elements, conviction of all three does not violate defendant's right to be free from double jeopardy.

## VII. SENTENCING

Defendant raises challenges to his sentences that warrant relief. In his Standard 4 brief, defendant aptly notes errors evident in the scoring of his offense variables (OVs). In a supplemental brief filed by appellate counsel, defendant demands relief based on *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

The interpretation and application of the statutory sentencing guidelines are legal questions subject to de novo review. *People v Cannon*, 481 Mich 152, 156; 749 NW2d 257 (2008).

> Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [*People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (citations omitted).]

See also *People v Steanhouse*, 313 Mich App 1, 38; ___ NW2d ___ (2015).

Defendant first takes issue with the assessment of 10 points for OV 1, relating to the "aggravated use of a weapon." MCL 777.31(1). The assessment of 10 points for this variable is

appropriate where "[t]he victim was touched by" a weapon other than a firearm, "knife or other cutting or stabbing weapon," "harmful biological substance, harmful biological device, harmful chemical substance, harmful chemical device, harmful radioactive material, harmful radioactive device, incendiary device, or explosive device." MCL 777.31(1)(a)-(d). Defendant contends that the trial court was not permitted to consider this variable because MCL 777.31(2)(e) precludes assessment when "the conviction offense is a violation of . . . MCL 750.82" (felonious assault). Defendant misinterprets the statute. MCL 777.31(2)(e) actually precludes assessment of five points when the conviction offense is felonious assault: "Do not score *5 points* if the conviction offense is a violation of . . . MCL 750.82 . . . ." (Emphasis added.) The court was free to score 10 points under the plain statutory language.

Defendant challenges the assessment of 10 points for OV 4, "psychological injury to a victim." When considering the scoring of OV 4, our Legislature has instructed that only "serious psychological injury requiring professional treatment" merits a score of 10 points. MCL 777.34(1)(a). The victim's failure to actually seek treatment does not prevent scoring 10 points for this variable. MCL 777.34(2). That treatment remains unrequested, however, does not eliminate the OV's concurrent requirement that the victim's psychological injury qualify as "serious" enough to merit professional intervention. Here, Bickel provided no victim impact statement. Bickel's trial testimony was full of colorful epithets and threats directed at his assailant. Bickel became quite angry on the stand and had to be given time to "calm down." However, the prosecutor directly asked Bickel if he was frightened and Bickel responded, "No, I was just pissed." Bickel indeed was angry enough to threaten to kill defendant right there in the courtroom. Bickel referred to being "traumatized" and that this affected his memory. Placed in context, this comment pertained to *physical* trauma. There is absolutely no evidence that Bickel has suffered anxiety, depression, or sleeplessness since this incident. Accordingly, we discern no evidence supporting the scoring of this variable.

Defendant argues that the trial court improperly assessed 25 points for OV 12. MCL 777.42(1)(a) provides for such a score when "[t]hree or more contemporaneous felonious criminal acts involving crimes against a person were committed." A contemporaneous felonious criminal act may only be counted, if it "has not and will not result in a separate conviction." MCL 777.42(2)(a)(*ii*). As the other offenses against a person committed by defendant that night all led to a conviction, the court improperly assessed points for this variable.

The court also assessed 25 points for OV 13. Such an assessment is proper when the sentencing offense "was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(c). Defendant's only challenge in this regard is that the court could not consider offenses that were scored under OV 12. See MCL 777.43(2)(c). As noted, the score for OV 12 must be eliminated. This correction remedies any previous error in assessing points for OV 13.

The court assessed 10 points under OV 19, which gauges, in relevant part, "interference with the administration of justice." MCL 777.49(1). Defendant contends that his act of resisting arrest does not fall within the scope of the measured conduct. This is simply not true. See *People v Hershey*, 303 Mich App 330, 344; 844 NW2d 127 (2013) (noting that "fleeing from police contrary to an order to freeze" amounts to an "interference or attempted interference with

the administration of justice"); see also *People v Ratcliff*, 299 Mich App 625, 633; 831 NW2d 474 (2013), vacated in part on other grounds 495 Mich 876; 838 NW2d 687 (2013).

Defendant's total OV score was originally calculated at 126 points, placing him in OV Level VI. Less the 35 points incorrectly assessed for OVs 4 and 12, defendant's total OV score is only 91 points and his OV Level is reduced to Level V. Defendant's recommended sentencing range under the legislative sentencing guidelines (with a fourth habitual offender enhancement) for his most serious offense is thereby reduced from 270 to 900 months to life imprisonment to 225 to 750 months to life imprisonment. As this correction alters defendant's sentencing guidelines range, we must remand for recalculation of defendant's scores and resentencing. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

We note that defendant also challenges the trial court's reliance on judicially found facts when assessing points for OVs 1, 2, 3, 6, 10, 13, and 19. The elimination of these scores would greatly reduce defendant's total OV score and drop his OV level even further. However, trial courts are still permitted to consider judicially found facts when imposing sentence as long as the court's findings are supported by a preponderance of the evidence. *Lockridge*, 498 Mich at 392 n 28; *Steanhouse*, 313 Mich App at 38. This claim therefore lacks merit.

On remand, the trial court must proceed consistent with *Lockridge* and this Court's pronouncement in *Steanhouse*, 313 Mich App 1. Pursuant to these precedents, a trial court must accurately score a defendant's offense and prior record variables but recognize that the sentencing guidelines ranges are advisory only when imposing sentence. *Steanhouse*, 313 Mich App at 38.

Accordingly, we affirm defendant's convictions, but vacate his sentences and remand for resentencing. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Elizabeth L. Gleicher