*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOSHUA ANTWAN LIGGINS,

        Defendant-Appellant.

UNPUBLISHED
August 29, 2024

No. 364319
Kalamazoo Circuit Court
LC No. 2021-001893-FC

Before: RICK, P.J., and JANSEN and LETICA, JJ.

PER CURIAM.

After a seven-day trial, a jury convicted defendant Joshua Antwan Liggins of eight counts of assault with the intent to commit murder (AWIM), MCL 750.83, and eight counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to concurrent sentences of 28 to 45 years' imprisonment for the AWIM conviction pertaining to victim Luciano Rinna (Luciano) and 22 to 40 years' imprisonment for the remaining seven AWIM convictions, exceeding the sentencing guidelines recommendation.[1] Each AWIM sentence was to be served consecutively to the mandatory two-year term of imprisonment imposed for its accompanying felony-firearm conviction. We affirm defendant's convictions, but vacate defendant's judgment of sentence and remand for resentencing.

In short, defendant's convictions arose from an incident in the parking lot of the Déjà Vu strip club in the city of Kalamazoo. Defendant fired seven bullets from a semi-automatic Glock at a raised four-door F-150 pickup truck occupied by eight men. Four bullets missed the pickup; three bullets did not. One bullet hit Luciano in the face. He was seriously injured, spent 33 days in the hospital, has numerous scars, and most likely has permanent numbness in his lip and chin. The same bullet that hit Luciano went through the front-seat passenger headrest before it struck

---

[1] Because two of those seven victims share a last name, we refer to all of the victims by their first names for clarity.

Jake McIllmurray (Jake) on his upper back right shoulder and inflicted a welt or burn.[2] A second bullet entered the pickup's tailgate, but it was stopped by a brace. A third bullet struck one of the pickup's tires, eventually flattening it.

The police quickly focused on defendant after reviewing a camera system used by the Kalamazoo Department of Public Safety (KDPS) to locate a vehicle matching the one that the police had identified as belonging to the shooter from Déjà Vu's surveillance footage. The police impounded defendant's gray Jeep Grand Cherokee, finding two spent shell casings in the area between the hood and windshield. The police also found an additional five shell casings near the area where defendant's Jeep had been parked. At trial, an expert testified that all seven shell casings were fired from the same weapon.

The police also executed a search warrant at defendant's residence. Inside, they found an empty Glock gun case for a firearm that used .40-caliber Smith and Wesson bullets, which matched the shell casings found at the strip club and on defendant's Jeep. The police also found a box that held fifty .40-caliber Smith and Wesson bullets, but only seven bullets remained.

Although the shooter could not be identified from the strip club's videotape alone, at trial, defendant admitted to being the shooter and discarding the Glock. Defendant, however, maintained that he had been overcharged and that he had no intent to kill anyone. From defendant's perspective, he simply made a bad choice and did not know who was in the pickup when he fired at it intending to hit the tires.

On appeal, defendant contends that the trial court abused its discretion when: (1) it denied his motion to quash, (2) it allowed the prosecution to present two photographs of a shotgun that the police found in defendant's bedroom closet because they were unrelated to the instant case, and (3) it allowed a police officer to testify about statements made by witness Marcus Harrison to a police officer. Defendant, *in propria persona*, also filed a Standard-4 Brief, arguing that: (1) the trial court erred when it denied his request to instruct the jury on a lesser offense, (2) there was insufficient evidence to support his AWIM convictions because he had no intent to kill anyone and did not even know how many people were inside the pickup, (3) his sentences were disproportionate, and (4) his trial counsel was ineffective for failing to request an independent criminal responsibility evaluation.[3]

## I. FACTUAL BACKGROUND

Testimony at trial established that Luciano, a full-time college student, and 19-year-old Trent Thomas (Trent) drove to Western Michigan University in Kalamazoo to visit their friends from high school on Friday, October 1, 2021. Those high-school friends included 19-year-old Quinton Mooney (Quinn), Quinn's roommate 20-year-old Max McIllmurray (Max), Max's 18-year-old brother Jake, and freshman Nicholas Morley (Nick). That evening, 20-year-old Zackary

---

[2] The remaining six victims were not physically injured.

[3] Issues (1) and (4) are not included in defendant's statement of questions presented, but mentioned in his Standard-4 Brief.

Nouhan (Zack) and junior Jackson Martin (Jack) joined the others at Quinn and Max's apartment. Quinn had a fifth of Captain Morgan rum and the men also had beer.

After midnight, the group decided to go to Déjà Vu, a Kalamazoo strip club. Max, their designated driver for the evening, drove them to the club in his 2008 big-lifted, four-door, red F-150 pickup truck. Max parked on the left side of the parking lot near the back.

Déjà Vu does not serve alcohol and allows those 18 and over to enter. Once inside the club, the friends kept to themselves and had no altercations with anyone. While they were inside the club, one of the strippers ripped off the elastic band from Trent's boxers.

At about 3:00 a.m., the eight friends left the club. There was a car parked next to Max's pickup. Marcus Harrison (Marcus), a man in his 40s, was associating with the people in that vehicle. Marcus's niece was celebrating her birthday and she jumped into the bed of Max's pickup and danced. Marcus's group was drinking.

After the others in Marcus's group left, Marcus remained behind, standing in the open front-passenger side door of Max's pickup and talking about his barbershop. Max was in the driver's seat while Jake sat in the front passenger seat. In the back seat, Zack sat behind Max; Nick was next, then Jack, and, finally, Luciano was seated behind Jake. Josh, a young man, was with Marcus.[4] Marcus wanted the men to join his barbershop clientele.

Trent and Quinn remained outside of Max's pickup. Trent was talking about having the band of his boxers torn off. Marcus's niece began yelling: "they rippin' off draw[er]s in the club." Two men, defendant and Anthony Harris (Anthony),[5] were walking by. According to Quinn, defendant was big, intimidating, wearing black clothing, and looking down on Trent. According to Trent, defendant remarked, "[K]eep that gay shit aways from me[.]" and "I don't play like that." Nick said that defendant approached them and was visibly upset over Trent's remarks about the stripper removing his boxer's elastic band. Nick testified that defendant said: "I don't want that fag[g]ot shit[;] I don't want that gay shit around me[;] like get it away from me[;] I don't want it." Nick testified that this interaction occurred when they were walking to Max's pickup from the club.

Trent testified that defendant came within feet of him and Trent was afraid that an altercation might follow. Jake also heard the commotion and recognized that Trent was having an argument with someone who was angry. Jake screamed at Trent to stop talking to them. Anthony was not part of the argument and was attempting to get defendant to leave. Marcus, however, intervened. In an attempt to calm defendant, Marcus said, "[C]hill, chill, chill[.]" According to Jake, Marcus "stiff armed" or pushed defendant away and just told him to go away. Jake then got back in the truck and did not think it was anything. Jack also testified that Marcus went to see

---

[4] KDPS Detective Sean Szekely later asked for contact information for Josh, but Marcus did not provide it.

[5] Because Anthony Harris' wife Aja was also there, Anthony and Aja are referred to by their first names.

what was happening at the back of the truck. It appeared that Marcus was trying to calm everyone, but Marcus himself did not recall any such encounter.

Thereafter, defendant and Anthony went to defendant's Jeep. It was backed into a parking spot about two car lengths behind Max's pickup.

Approximately five minutes later, defendant returned and began talking to Quinn, who had been drinking in the parking lot. At that point, Quinn did not consider himself to be impaired. Quinn testified that defendant approached him and asked if they had anything on them. Quinn did not hear what defendant had said and asked him to repeat himself. Defendant asked if they "got anything." Still confused, Quinn asked defendant what he meant. Defendant responded: "Molly, ecstasy pills, like do you have anything, like he was desperate . . . ." Quinn showed defendant his fifth of rum and defendant "pretty much demanded a swig of the liquor," which Quinn gave him. Defendant took a shot. Quinn opined that defendant seemed intoxicated and "a little bit" aggressive. Anthony came up, began to grab defendant's arm or tap him on the shoulder, and motioned for defendant to leave. Trent testified that, after a little bit of back and forth, defendant and Anthony returned to defendant's Jeep.

During that time, Trent and Quinn remained outside of Max's pickup. Marcus had been trying to convince the men inside the pickup to come to a party with him and to see his barbershop. According to Max, Marcus said it was not safe for all of them to be in the truck and that one of them should go with him. But Marcus testified that he was simply warning Trent and Quinn that they could not ride in the bed of the pickup because "this is close to the hood" and the police would pull them over for doing so.

Nonetheless, Trent got into the bed of Max's pickup with Quinn. Max reversed to back out of his parking space. Max had enough room to back out and was not worried about striking another vehicle. After Max stopped for a second, shots rang out. Max then sped off.

Trent heard booms, saw flashes and smoke in the air, and smelled gun powder. Trent saw the top of defendant's dark gray Jeep and testified that the shots were coming from its driver's side, even though Trent could not see anyone shooting. Jake described the shots as coming from directly behind them. Zack also testified that the shots came from behind them as did Luciano. Marcus heard the gunshots as he was pulling out of his parking spot, testifying that the shots were "dinging off the cars[.]"

When Jake looked, he saw a bullet hole in the back window of Max's pickup. After Quinn unsuccessfully tried to call one of those inside the pickup, he stuck his head out of the pickup's bed and looked through the back window to see a lot of blood coming from Luciano. Quinn told Trent that Luciano had been shot. Nick was yelling that Luciano got shot. Nick testified that Luciano was screaming, asking whether he had been shot. Nick told Luciano that he was shot and that he was going to be all right.

Max and Jake realized that Luciano's situation was dire because there was a lot of blood. Luciano was trying to speak, but he was gurgling. Jake used his phone to access maps for hospitals and called 911.

At about 3:24 a.m., KDPS Sergeant Joseph Hutson was dispatched to a shooting at an address he recognized as belonging to Déjà Vu. On Sergeant Hutson's way to the club, he learned about Jake's 911 call. Sergeant Hutson realized that the pickup was traveling on the longer route to the hospital. Sergeant Hutson located the pickup and followed it with his emergency lights activated, watching Max speed and run red lights.

After Luciano arrived at the hospital, Jake reported that he felt stinging while Max was driving to the hospital and Jake thought that he could have been shot as well. Quinn checked Jake and they discovered a welt or burn on Jake's upper back right shoulder. The bullet went through the pickup's back window, Luciano's face, and the passenger-side headrest before striking Jake.

Sergeant Hutson saw the bullet hole in the pickup's rear window. He also saw another bullet hole in the tailgate area. Inside Max's pickup, Sergeant Hutson found a tooth and some soft tissue in front of the rear passenger side where Luciano had been sitting. Sergeant Hutson also saw the bullet hole in the rear of front-passenger headrest and found a bullet in the front passenger seat. Sergeant Hutson also searched the men and did not find any weapons.

In the interim, Marcus drove to the hospital in his Range Rover and stopped at the parking garage. The police searched Marcus's Range Rover and found nothing. They asked Marcus and Josh "a bunch of questions." Marcus told them "didn't have nothing to do with nothing[.]" The reason that Marcus went to the hospital was to make sure that Luciano was okay.

A KDPS laboratory technician documented the bullet impacts to the lower right corner of the pickup's tailgate area and its right-rear passenger windshield. He also described the blood on the pickup's door and seats as well as the teeth on the floorboard. And he documented the lead core of the fired bullet in the front passenger seat and the copper jacketing from that fired bullet between the seat and door area. Using a trajectory rod, the technician opined that the bullet that came through the pickup's back window and hit something else before it went through the front seat passenger's headrest. A second bullet entered the tailgate, hit a brace, and stopped.

Several police officers searched the Déjà Vu parking lot. They found five shell casings in total in the very southeast portion of the parking lot. Two casings were in close proximity to the area where defendant had been parked. The police found another casing immediately outside of defendant's parking space in a bush and two additional casings in the grass. One of the officers also found shards of a taillight to a vehicle in the parking lot about twenty yards from where the casings were located. Because a Glock typically ejects casings to the right, it was possible that the two casings further back rolled off defendant's Jeep or that they were displaced when defendant drove off or that they ricocheted off the side of the vehicle.

Another KDPS police officer used the city's Flock system to locate a dark gray Jeep via data collected from cameras located in the city. One of the city's cameras captured defendant's Jeep at cross streets probably less than ten minutes from Déjà Vu, at 3:28 a.m. The officer ran the license plate from that vehicle through the Law Enforcement Information Network. The Jeep was registered to defendant. The officer then obtained defendant's Secretary of State photograph and compared it to a still shot from the Déjà Vu security camera.

Thereafter, the police located defendant's Jeep and impounded it. They found two spent shell casings between the hood and front windshield. Both shell casings were .40 S&W Win, meaning that they were Smith and Wesson ammunition manufactured by Winchester. The police also seized glasses, a prescription bottle belonging to defendant, and an employee identification bearing defendant's name.

Although the police had searched Max's pickup, after Max took it home, he found a bullet fragment on the passenger floorboard. There was a lot of blood and a chunk of Luciano's face, mouth, or tongue on the floorboard as well; nevertheless, the bullet fragment stood out because it was shiny. Max called KDPS Detective Sean Szekely about this and the detective collected it. Additionally, one of the tires on Max's pickup slowly flattened due to a bullet lodged in its rubber.

Five days after the shooting, several KDPS members executed a search warrant at defendant's apartment. One of the officers found a black Glock pistol .40-caliber magazine and a box of ammunition. The ammunition was labeled Winchester .40-caliber S&W (Smith and Wesson) 180 grain. The shell casings found in Déjà Vu's parking lot and on defendant's Jeep had the same markings. The ammunition container held 50 bullets, but only seven remained.

Another officer found an extended magazine for .9 mm ammunition in defendant's apartment. A separate officer found the dark clothing that defendant had worn at Déjà Vu in the washing machine. In defendant's bedroom closet, the police also found a shotgun. Notably, the police found an empty gun case for a Glock 22 that used .40-caliber S&W bullets.

Of the twenty surveillance cameras at Déjà Vu, four of them captured portions of the incident. KDPS Specialist Gary Latham, an expert in forensic video analysis, testified that these cameras were set to pick up motion in a given area and that gaps occurred due to a lack of potential motion activating the cameras. Between clips 3 and 4, for example, there was a gap of about one minute and fifteen seconds. Latham also created enlargements of certain Déjà Vu clips. During the trial, the prosecutor played the Déjà Vu surveillance footage while Detective Szekely narrated it.

In Exhibits 8 and 9, Detective Szekely identified Max, Nick, Luciano, Jake, Quinn, Zack, Jack, and then Trent walking to Max's red F-150 pickup at about 3:00 a.m. Trent was showing the waistband from his boxers to the people in front of him. Detective Szekely also identified Marcus's white Range Rover and defendant's gray Jeep in the parking lot. The young men were congregated around the pickup. Defendant and Anthony were seen approaching the front of the club. They interacted with the bouncer, showing him their identification.

Additionally, defendant and Anthony were seen walking to the back part of the parking lot. Defendant appeared to be engaging with Trent. Although difficult to see, the person believed to be Marcus came between Max's pickup and a vehicle on the other side while Trent and defendant were present. Marcus then walked back to Max's pickup. Defendant and Anthony returned to defendant's Jeep.

In Exhibit 10, after 3:19 a.m., a person was seen walking toward the back of the pickup. Defendant got out of the driver's side of his Jeep and approached the passenger side of the pickup. A person also came out of the passenger side of defendant's Jeep.

-6-

Exhibit 11 picked up about a minute and fifteen seconds later. The time gap between Exhibits 10 and 11 was the missing surveillance footage testified to by expert Latham. Quinn was getting into the back of the pickup. Marcus's vehicle was visible because its dome light was activated. Trent was in the area between Marcus's Range Rover and Max's pickup. Trent followed Quinn.

Max backed his pickup out of its parking spot. Marcus was seen leaving his parking spot as well. Once Max completed the reversing process, he moved forward.

The driver's side door of defendant's Jeep was opened. There were flashes near the driver's side door. Marcus's Range Rover left the parking lot. It was followed by defendant's gray Jeep Grand Cherokee. Max's pickup was not seen leaving the parking lot in Exhibit 11 because the pickup exited to the right, not to the left.

Exhibit 12 showed a different camera angle. Again, it showed Max reversing his F-150 pickup, the open driver's side door of defendant's Jeep, and a flash and smoke from the area of defendant's Jeep. Defendant's, Max's, and Marcus's vehicles were all visible. Marcus's Range Rover exited the parking lot to the left, while Max's pickup exited to the right and defendant's Jeep exited left.

Exhibit 80, as enlarged by expert Latham, showed Trent getting into the bed of Max's pickup. Max backed up. The driver's side door of defendant's Jeep opened and flashes of light were seen near the driver's side door. Max sped off and defendant fled in his Jeep.

During the police investigation, Detective Szekely spoke with defendant's fiancée London Lockett (London) and the police determined that there were four people in defendant's Jeep during the shooting. Detective Szekely then interviewed Anthony and Aja Harris. Although they were not cooperative, their statements were consistent with the surveillance video footage taken at Déjà Vu.

Additionally, Detective Szekely sent all seven shell casings the police collected to the Michigan State Police Crime Laboratory. An expert in firearms and tool mark examination inspected the spent casings and determined that they all had sufficient individual matching characteristics for him to opine that they were fired by the same weapon. The expert's report was admitted as an exhibit.

Detective Szekely acknowledged that the police did not know who had entered the driver's seat in defendant's Jeep, including from the video surveillance. Moreover, he had not sought to have the collected casings tested for DNA or fingerprints.

At trial, Luciano testified that when he awoke in the hospital, his mouth was wired shut. He had a tracheostomy tube and a feeding tube. He could not talk, eat, or swallow, and was hospitalized for 33 days. Even after he was discharged from the hospital, Luciano's mouth remained wired shut. Luciano had scars from the bullet that struck him and from his medical treatment. Luciano also had to drop out of college and had to learn to eat and walk again.

Initially, Luciano's oral surgeon was concerned that Luciano would lose his airway and be unable to breathe. The surgeon explained that the bullet entered Luciano's upper right jaw near

his upper lip and exited just below his left ear. The bullet fractured his upper jaw and severely fractured his lower left jaw. Luciano required additional surgery to reconstruct his upper jaw for future dental implants. The bullet had also travelled through one of the main sensory nerves in Luciano's lower lip and chin so he would most likely have numbness in those areas for the rest of his life. Luciano would also need additional surgeries.

At trial, defendant testified that he did not work on October 1, 2021. Instead, he went out for dinner with his fiancée and ordered a martini. While they were out, they encountered Anthony and Aja Harris, who was his fiancée's cousin.[6] Defendant and his fiancée then went over to the Harris home, had a couple of drinks, and talked.

Later, defendant drove all four of them to Déjà Vu in his Jeep. He parked in the back, where they hung out and listened to music. Although Aja did not have identification, defendant thought he knew someone that would allow her inside the club without it. Defendant and Anthony spoke to the bouncer, but he told them that identification was required to enter.

According to defendant, the plan was to go back to the Jeep and hang out with their partners. Instead, defendant interacted with Josh. Defendant simply asked Josh how his night was going. Josh became very aggressive and swore at defendant.[7] Defendant told Josh to "get the fuck back" and Marcus intervened. Trent was behind Josh and Trent could have thought that defendant was speaking to him. This interaction lasted a minute or two. Although defendant saw Trent, he did not see any of the other men. Anthony did not have words with anyone.[8]

Defendant did not notice Marcus's niece "twerking," did not hear the comment about Trent's drawers, and did not see Trent with the elastic band from his boxers. Moreover, defendant denied uttering the homophobic slurs attributed to him by Trent and Nick, explaining that his brother is gay and defendant did not tolerate such remarks.

After hearing the yelling and commotion, London and Aja left defendant's Jeep to see what was happening. Later, they all walked back to defendant's Jeep together. They listened to music and talked. Defendant was drinking. Defendant testified that his intoxication level was not high, but he was "buzzing." While others in defendant's party were smoking marijuana, he was not

---

[6] Curiously, defendant initially identified Aja as his fiancée's cousin, but he later testified that he went to school with Aja "and so she became my sister." After Aja married Anthony, Anthony basically became defendant's brother.

[7] Defendant and Marcus are African-American; Josh and the eight men in the pickup are Caucasian. After the guilty verdict was announced and defendant was being led away from the courtroom, there was an allegation that defendant "mumbled" the word "racist" or otherwise indicated that his "conviction was the result of racism" to the victims and their families.

[8] Outside of the jury's presence, Anthony invoked his Fifth Amendment rights and the prosecution was prepared to offer both Anthony and Aja use immunity; however, Anthony's counsel indicated that he desired full transactional immunity. Although the court took the matter under advisement, the prosecutor opted not to call Anthony or Aja and they were released from their respective subpoenas.

because his lungs were damaged from pneumonia. Defendant did not use drugs. Defendant remembered some of his actions that night, including that he was in the driver's seat of his Jeep.

Defendant explained that he saw Trent with Quinn and did not want any "bad blood taste in [their] mouths[.]" Defendant and Anthony then approached Max's pickup as the Déjà Vu surveillance videotape showed. Defendant did not have any animosity toward them. The men offered defendant liquor and he might have accepted it to be friendly. Defendant spent about two to three minutes with Trent and Quinn before returning to his Jeep.

Defendant was in the front driver's seat with London next to him in the passenger seat. Aja sat behind defendant while Anthony sat behind London. The group continued to talk.

When Max's pickup "boxed" them in, defendant asked: "[W]hat the hell is going on?" Defendant got out of his Jeep with the semi-automatic Glock he had retrieved from under his front seat. Defendant had legally purchased the firearm as well as the shotgun and ammunition the police later found in his apartment. Defendant did not have a concealed weapons license, but kept the Glock in his Jeep after recent criminal activity near his apartment complex.

Defendant "wa[]ved them off, nobody move[.]" Defendant did not step into a clear opening to shoot, but remained by his vehicle and its door. Defendant fired six or seven shots, but did not remember exactly how many shots he fired. Defendant admitted that he was the person that opened the door before he shot the Glock with his right hand.

Defendant testified that he was aiming "[a]t the ground near the tires" and that he "shot at the ground real fast." Defendant did not realize that someone could be injured if he did that. Defendant was not angry and not thinking about his earlier interactions that night. He simply thought it would scare them away. Defendant had never shot a gun before[9] and, when the recoil hit back, it was uncontrollable. Despite Max's pickup being about two car lengths in front of defendant's Jeep, defendant did not know who was inside it.

Defendant testified that he made a "dumb" or "reckless" decision because he panicked. Defendant shot to scare whoever was boxing his Jeep in, but he never intended to hurt anyone. Defendant had nightmares that night because he did not want the young men to be hurt. Defendant admitted that he recklessly discharged a firearm and committed felonious assault. However, defendant could not plead guilty to something he did not do and he did not intend to kill or murder anyone. It was the stupidest thing defendant had ever done and he did not even realize that he hit the vehicle. Only after Aja sent London a message the next day did defendant learn that someone had been harmed.

---

[9] Defendant elaborated that he had never visited a gun range or learned how to stand before shooting the firearm.

Defendant did not know the extent of that person's injuries, but he wanted to make a statement. Once defendant obtained proper representation,[10] however, he was directed not to do so and he discarded the Glock.

After the parties rested, the jury deliberated and convicted defendant of eight counts of AWIM and felony-firearm. Defendant appealed.

## II. MOTION TO QUASH

Defendant contends that the circuit court abused its discretion when it denied his motion to quash the AWIM and related felony-firearm charges pertaining to Nick, Quinn, Zack, Jack, and Max.[11] We decline to review this issue because there was sufficient evidence presented to support defendant's convictions as discussed in Issue VI. See *People v Wilson*, 469 Mich 1018; 677 NW2d 29 (2004) ("Because [the] defendant was fairly convicted of the crimes at trial, he could not appeal the sufficiency of the evidence at the preliminary examination and the Court of Appeals erred in reviewing his claim.").

## III. EVIDENTIARY ERROR

Defendant argues that the trial court abused its discretion when it allowed the prosecution to present two photographs of a shotgun that the police found in his bedroom closet because the shotgun was unrelated to the instant case. Although we agree, we conclude that this error was not outcome determinative in light of the remaining evidence.

## A. ISSUE PRESERVATION

"A defendant must raise an issue in the trial court to preserve it for our review." *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). During trial and outside of the jury's presence, defense counsel objected to the evidence of a shotgun on relevancy grounds, adding that even if this evidence was relevant, its probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Defense counsel argued that this shooting did not involve a shotgun and it was only being presented to show that defendant was "some kind of gun . . . nut." The prosecutor responded that the shotgun was relevant to "give[] a full context" to the search warrant's execution and to show "[d]efendant's access to firearms," especially given that the actual firearm used to commit these crimes was never found. Given that the weapon involved was never found, the trial court ruled that it would allow testimony about what was found during the search. Nevertheless, the court questioned whether it was necessary to admit the actual shotgun, which was a separate proposed prosecution exhibit.[12]

---

[10] Defendant's trial counsels did not represent him at that time.

[11] Defendant did not challenge the district court's bindover of the AWIM and the accompanying felony-firearm charges involving Luciano, Jake, and Trent.

[12] The prosecution never moved to admit the actual shotgun.

-10-

After the jury returned, the prosecutor handed KDPS Detective Tim Knight two photographs of the shotgun. Defendant's other trial counsel said that she had "[n]o objection" and these exhibits were received. The prosecution contends that this waived defendant's earlier objection to the admission of the photographs. A waiver is "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 210; 612 NW2d 144 (2000) (quotation marks and citation omitted). But, under MRE 103(a),[13] once the court rendered a definitive ruling on the record admitting the photographs, defendant did not need to renew his objection to preserve his claim of error for appeal. Thus, contrary to the prosecution's argument, this issue was preserved by defendant's initial objection.

## B. STANDARD OF REVIEW

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). "When the decision regarding the admission of evidence involves a preliminary question of law, such as whether a statute or rule of evidence precludes admissibility of the evidence, the issue is reviewed de novo." *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003), reh den 469 Mich 1224 (2003). An abuse of discretion "exists when the trial court's decision falls outside the range of principled outcomes." *People v Gipson*, 287 Mich App 261, 262; 787 NW2d 126 (2010). A trial court necessarily abuses its discretion when it makes an error of law. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). But an evidentiary error is not a basis for reversal unless "it is more probable than not that the error was outcome determinative." *Lukity*, 460 Mich at 495. See also MCL 769.26 (requiring a miscarriage of justice to reverse on the basis of an evidentiary error).

## C. ANALYSIS

"Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v Horton*, 341 Mich App 397, 403-404; 989 NW2d 885 (2022), quoting MRE 401. However, "MRE 403 provides that relevant 'evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Horton*, 341 Mich App at 404. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Id*., quoting *People v Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010) (quotation marks, citation, and alteration omitted).

This Court has previously addressed the admissibility of weapons at trial, recognizing:

> Weapons or other instruments which are in no way, or not sufficiently, connected with the crime, or concerning which there is insufficient evidence from which a jury might reasonably infer that they were used in the commission of the crime, are

---

[13] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). This opinion refers to the court rules in effect during defendant's trial.

-11-

inadmissible to show that they were so used, even where they are connected with accused, and certainly where they are not connected with accused. However, a weapon or instrument found in the possession of accused or of his criminal associates which, although not identified as the one actually used, is similar in form and character thereto, or which, from the circumstances of the finding justifies an inference of the likelihood or possibility of its having been used, is admissible for the purpose of showing availability to accused of the means of committing the crime in the manner in which it is shown to have occurred, or for the purpose of illustration, or of showing preparation, or the state of mind or intent of accused. Moreover, weapons known or conceded not to have been used in the crime are admissible where they have some probative weight or where they constitute part of the picture. [*People v Miner*, 22 Mich App 673, 676; 177 NW2d 719 (1970), quoting 22A CJS Criminal Law, §712, pp 965-967.][14]

See also *People v Kramer*, 103 Mich App 747, 759; 303 NW2d 880 (1981) (shotguns found in a van, although not the sawed-off shotgun directly connected to the charged crimes, were admissible after a witness testified that one of the robbers held a shotgun or rifle).

In this case, the police found an empty gun case for a Glock 22 .40-caliber handgun, a Glock magazine, an extended magazine, and a box of .40-caliber Smith & Wesson ammunition in defendant's apartment. An expert opined that the two .40-caliber Smith & Wesson spent shell casings found on defendant's Jeep and the five .40-caliber Smith & Wesson spent shell casings found near the area where defendant's Jeep had been parked were fired by the same firearm. On appeal, the prosecution no longer asserts that the photographs of the shotgun were relevant to "give[] a full context" of the search warrant's execution. Instead, the prosecution continues to argue that the shotgun was relevant because it showed "[d]efendant's access to firearms." The shotgun, however, was not sufficiently connected with these crimes and there was insufficient evidence to permit a jury to reasonably infer that the shotgun was used to commit these crimes.[15] See *Miner*, 22 Mich App at 676, quoting 22A CJS Criminal Law, §712, pp 965-967. Moreover, the shotgun was not similar in form or character so as to the give rise to an inference that it was likely or possibly the weapon used to commit the crimes. *Id*. Thus, the shotgun lacked any probative value as to this criminal incident and the trial court abused its discretion in admitting the photographs of the shotgun.

Nevertheless, the trial court's error in admitting two photographs of defendant's lawfully-possessed shotgun was not outcome-determinative in light of the untainted and overwhelming evidence of defendant's guilt as discussed in the statement of facts and Issue VI (addressing the

---

[14] Although *Miner* is not binding under MCR 7.215(J)(1) because it was decided before November 1, 1990, "it nevertheless 'has precedential effect under the rule of stare decisis.' " *People v Ziegler*, 343 Mich App 406, 413 n 6; 997 NW2d 493 (2022).

[15] Subsequently, defendant admitted that he used the Glock to commit these crimes. An empty gun case for the Glock was found in defendant's apartment. Detective Szekely also testified that the police never recovered the firearm involved in this incident. Simply put, there was no testimony that the shotgun was used, or even capable of being used, to commit these offenses.

sufficiency of the evidence). See *Lukity*, 460 Mich at 495. See also MCL 769.26. Defendant is not entitled to relief on this claim.

## IV. IMPEACHMENT TESTIMONY

Defendant argues that the trial court abused its discretion when it allowed a police detective to testify about statements witness Marcus Harrison made to him for the purpose of impeaching Marcus's testimony that he did not recall making those statements. We disagree.

### A. STANDARD OF REVIEW

"When [an] issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion . . . ." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). An abuse of discretion "exists when the trial court's decision falls outside the range of principled outcomes." *Gipson*, 287 Mich App at 262. A trial court necessarily abuses its discretion when it makes an error of law. *Duncan*, 494 Mich at 723. If, however, the issue is unpreserved, we review "for plain error affecting substantial rights." *Id*. "When the decision regarding the admission of evidence involves a preliminary question of law, such as whether a statute or rule of evidence precludes admissibility of the evidence, the issue is reviewed de novo." *Washington*, 468 Mich at 670-671. An evidentiary error is not a basis for reversal unless "it is more probable than not that the error was outcome determinative." *Lukity*, 460 Mich at 495. See also MCL 769.26 (requiring a miscarriage of justice to reverse on the basis of an evidentiary error).

### B. ANALYSIS

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' " *Chelmicki*, 305 Mich App at 62-63, quoting MRE 801(c). The general rule is that "prior unsworn statements of a witness are mere hearsay and are generally inadmissible as substantive evidence." *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002). However, "[e]xtrinsic evidence of a prior inconsistent statement can be used to impeach but it cannot be used to prove the truth of the matter asserted, unless, of course, it falls within a hearsay exception." *People v Jenkins*, 450 Mich 249, 273; 537 NW2d 828 (1995).

MRE 613 addresses a witness's prior statements:

(a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request it shall be shown or disclosed to opposing counsel and the witness.

(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

On direct examination at trial, Marcus testified that, after the people with him left, he remained at the truck with Josh. Marcus stayed on the passenger-side of the truck throughout his interaction with the men. Marcus did not remember one of the young men having a confrontation with someone else in the parking lot. And Marcus did not see anyone aside from the young men approach their truck. When the prosecutor later asked whether Marcus saw anyone approaching the pickup, Marcus responded, "I don't recall that."

Marcus also testified that he heard the shooting coming from behind. However, he "really didn't see nothing," in part, because his vehicle's windows were tinted and, in part, because he focused on leaving the area upon hearing the shots.

After Marcus arrived at the hospital, the police asked him what he saw or knew and he "told them the same thing," i.e., he "didn't know" and he "fled." Initially, Marcus did not recall whether he spoke to more than one officer at the hospital, but remembered talking to at least one officer. Marcus told that officer what he had told the jury. This exchange followed:

> *Q.* Sir, do you remember talking to one of those officers and saying that a male confronted one of the white boys from Western Michigan University?
>
> *A.* That I what?
>
> *Q.* That a black male had confronted one of the white males that you were talking about –
>
> *A.* I don't - -
>
> *Q.* – from Western Michigan [U]niversity?
>
> *A.* I don't recall that.
>
> *Q.* Do you remember telling officers that some words were exchanged?

At that point, defense counsel objected, stating that if the prosecutor was refreshing Marcus's recollection, she could simply let him review something to refresh his memory given Marcus's lack of recall. Defense counsel added, "She is actually engaging him in impeachment." The prosecutor responded that was what she was doing. The court overruled defense counsel's objection. The exchange continued:

> *Q.* Do you recall telling officers that there were some words exchanged?
>
> *A.* I don't recall that. It was a year ago and I don't remember. I can't tell you what happened last week.
>
> *Q.* Sure. Okay. That's fine. And then do you recall telling officers that you heard several shots being fired towards where there was a Jeep Cherokee [defendant's vehicle] and a red F150 [Max's pickup]?

*A*. I remember saying that there was shots fired and I know that because that's why I left.

When the prosecutor asked whether it would refresh Marcus's recollection if he was shown some of his statements, he denied that it would because he did not recall them.

*Q*. Okay. All right. Do you remember telling officers when you were at the parking ramp -- those officers that you talked to that there was a black male who was frustrated with the group of friends that you were talking to?

*A*. No.

*Q*. Okay. And did you -- do you remember telling officers at the parking ramp there that you could not recall who the shooter was, but that it, was the big, tall guy with glasses –

*A*. No.

*Q*. – because he was so upset?

*A*. No.

*Q*. No. Okay. Do you remember telling officers that you had thought that the shooter was actually that big, tall guy with glasses was actually shooting at you because he was mad that you were befriending the kids?

*A*. No, I don't recall that either.

*Q*. Okay.

*A*. I told you it was a year ago –

*Q*. Sure.

*A*. – and I don't recall.

*Q*. That's all right. You can say, no, you don't recall. Do you recall telling officers that the big black male that you saw confronting the one Western student was aggressive?

*A*. No.

THE COURT: That was a no?

[MARCUS]: No.

THE COURT: You don't recall? Okay.

[MARCUS]: No, I don't recall.

-15-

Later, Detective Knight testified that Marcus approached the police at the hospital and informed them that "he had witnessed a shooting at the Déjà Vu" so the detective decided to obtain a brief statement from Marcus. Defense counsel objected and a bench conference followed. Counsel objected "to any statements that [Marcus] might have made to this Detective." More specifically, defense counsel noted Marcus's lack of memory and that the prosecutor never afforded Marcus "an opportunity to explain or deny some of the things that she might be trying to impeach him with at this point with the officer's testimony," despite asking Marcus some questions. In defense counsel's view, the prosecutor's failure to show Marcus the police report containing his statements, Marcus did not have an opportunity to deny or explain any of them. "[B]ased on that . . . any effort here to try and bring up statements from this Detective would be inappropriate because the proper foundation hasn't been laid with [Marcus]."

The prosecutor responded that the only foundation required to impeach Marcus was that he remembered talking to the officer and his failure to recall making those statements. Defense counsel reiterated that those statements should have been shown to Marcus. When the court inquired about the court rule basis for defendant's objection, counsel cited MRE 607, MRE 608, and MRE 609. The prosecutor repeated that she was impeaching Marcus, not refreshing his recollection. The prosecutor added that she asked Marcus about his prior statements to the police and he did not remember making them. Defense counsel asked the prosecutor to identify the specific questions she had asked. The prosecutor replied, "I asked [Marcus], do you remember telling the officer that the black male confronted one of the white males (inaudible) and some words were exchanged[.] And [Marcus said that] he didn't recall." The trial court recollected the same testimony from Marcus.

Defense counsel then raised a new objection, rooted in caselaw, contending that the prosecutor could not call Marcus knowing that he would claim a lack of memory and then impeach him with his prior statement. Such impeachment could not be offered for the truth of the matter asserted and could only be offered to challenge the witness's credibility. Defense counsel then said: "I am guessing, the Prosecution knew when they called him," before the prosecutor interjected: "[T]hat's where you are incorrect because I didn't." The trial court then overruled defense counsel's objection.

Thereafter, Detective Knight testified that Marcus informed him that he had befriended the Western students and "witnessed an altercation between a larger black male [defendant] and one of the Western students[16] where some words were exchanged." Additionally, Marcus indicated that he witnessed the shooting. Specifically, Marcus said that "he looked over" after hearing the shots and "he noticed that the same larger black male gentleman [defendant] who was also earlier seen by him sitting in the driver's seat of [the] grey Jeep had been firing a gun toward the direction of the pickup truck that the Western students were in." Marcus's statement was recorded on Detective Knight's body camera.

However, Detective Szekely testified that he never received body camera footage from Detective Knight in this case. Detective Szekely further testified that Marcus told him that he

---

[16] The trial testimony established that Trent did not attend Western, but was with the Western students.

-16-

believed that defendant was the shooter because defendant, not Anthony, was the aggressor with Trent.  Marcus also told Detective Szekely that "he did not see the shooter, but assumed it was them or [that] it was coming from that direction because of what he just witnessed between [Trent] and [defendant]."  On cross-examination, Detective Szekely further testified that he specifically asked Marcus if he earlier told Detective Knight that Marcus saw the shooter.  Marcus denied telling Detective Knight that he saw the shooting.  Instead, Marcus explained that he assumed they were the shooters because they were the only ones back there and it was coming from that direction.  Detective Szekely's interview with Harris was recorded.[17]

The trial court's final instructions to the jury explained that a witness's prior inconsistent out-of-court statement could only be used to determine the witness's credibility, not the truth of the matter asserted.  "Jurors are presumed to follow their instructions and jury instructions are presumed to cure most errors." *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) (quotation marks and citation omitted).

Initially, defendant objected on the ground that the prosecutor laid an insufficient foundation to admit extrinsic evidence of Marcus's statement to Detective Knight.  We disagree.  The law is clear that a statement is inconsistent when it omits a material fact that the witness previously gave, including when the witness claims not to remember making a prior inconsistent statement.  *Jenkins*, 450 Mich at 256.  Therefore, the trial court did not abuse its discretion when it overruled defense counsel's objection on this basis.

However, "a prosecutor may not use an elicited denial as a springboard for introducing substantive evidence under the guise of rebutting the denial." *People v Stanaway*, 446 Mich 643, 639; 521 NW2d 557 (1994).  It is improper for a prosecutor to " 'use a statement that directly tends to inculpate the defendant under the guise of impeachment when there is no other testimony from the witness for which his credibility is relevant to the case.' " *People v Shaw*, 315 Mich App 668, 684-685; 892 NW2d 15 (2016), quoting *People v Kilbourn*, 454 Mich 677, 682; 563 NW2d 669 (1997).  Although the substance of one of the statements purportedly used to impeach Marcus's credibility was relevant to the central issue of the case, namely, defendant's identity as the shooter, Marcus also testified "about a number of events that took place before the shooting, and . . . was a key actor in some of these events." *Kilbourn*, 454 Mich at 683-684.  Accordingly, the trial court did not abuse its discretion in permitting the prosecutor to impeach Marcus with his prior

---

[17] Detective Szekely also testified that Marcus shared a second reason why Marcus believed defendant was the shooter.  Marcus overheard defendant asking what else they had during defendant's second interaction with the young men.  Quinn testified defendant approached him and repeatedly asked for drugs or whether Quinn had anything else, "like [defendant] was desperate. . . ."  Defendant's statement made Marcus uncomfortable and he thought a robbery was going to occur.  Although there was additional questioning regarding Marcus's statement about a robbery, it was unclear whether Detective Szekely recorded it.

statements to Detective Knight about seeing defendant shooting or witnessing the interaction between Trent and defendant.[18]

## V.  INSTRUCTIONAL ERROR

Defendant contends that the trial court denied his request to have the jury instructed on a lesser offense.  This issue is not preserved for appeal because defendant did not raise it in his statement of questions presented.  MCR 7.212(C)(5).  See *People v Lowrey*, 342 Mich App 99, 119 n 5; 993 NW2d 62 (2022).  And, even if defendant had properly raised this issue by including it in his statement of questions presented, he abandoned it by failing to identify the lesser-included offense instruction that the trial court should have read to the jury, by failing to explain his supporting rationale, and by failing to cite any authority supporting his position.  *People v Henry*, 315 Mich App 130, 148; 889 NW2d 1 (2016) (quotation marks and citation omitted) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority."); *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004) ("An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue.").  Even setting aside these procedural failures, the trial court placed on the record that "[t]here was no request for a lessor [sic]" offense instruction.  Therefore, defendant's factual premise that the trial court denied him an unidentified lesser-offense instruction is incorrect.[19]  For all of these reasons, defendant is not entitled to any relief on this issue.

## VI.  SUFFICIENCY OF THE EVIDENCE

Defendant contends that there was insufficient evidence to establish that he had the required intent to kill to support his AWIM convictions.  We disagree.

---

[18] Even if the trial court had abused its discretion, any error was not outcome-determinative in light of the overwhelming evidence of defendant's guilt as discussed in the statement of facts and Issue VI (addressing the sufficiency of the evidence).  See *Lukity*, 460 Mich at 495.  See also MCL 769.26.  Defendant himself testified that he was the shooter.  Moreover, the Déjà Vu security camera, Exhibit 9, seemingly captured Marcus's intervention during defendant's interaction with Trent, and other witnesses recounted Marcus's intervention, even if Marcus did not remember it.

In light of our conclusion, we decline to address the prosecution's newly-raised argument that Marcus's statement identifying defendant as the shooter was substantively admissible under MRE 801(d)(1)(C).

[19] The decision whether to request an instruction on a lesser included offense is a matter of trial strategy, *People v Sardy*, 216 Mich App 111, 113; 549 NW2d 23 (1996), and a decision to forgo a charge on a lesser-included offense and instead "force the jury into an 'all or nothing' decision" does not constitute ineffective assistance of counsel.  *People v Rone (On Second Remand)*, 109 Mich App 702, 718; 311 NW2d 835 (1981).  See also *People v Nickson*, 120 Mich App 681, 687; 327 NW2d 333 (1982) ("The decision to proceed with an all or nothing defense is a legitimate trial strategy.").

This Court reviews de novo challenges to the sufficiency of evidence in a jury trial. *People v Gaines*, 306 Mich App 289, 296; 856 NW2d 222 (2014). To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, an appellate court reviews "the evidence in the light most favorable to the prosecutor to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

Under MCL 750.83, "[a]ny person who shall assault another with intent to commit the crime of murder, [is] guilty of a felony, punishable by imprisonment in the state prison for life or any number of years." To support a charge of assault with intent to commit murder, the prosecution must establish that: (1) the defendant committed an assault; (2) the defendant had the specific intent to kill the victim; and (3) had the assault been successful, defendant's killing would have constituted murder. *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011). "The intent to kill may be proved by inference from any facts in evidence." *Id*. "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish a defendant's state of mind[.]" *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). A defendant's intent to kill may be inferred from all the evidence, including " 'the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made.' " *People v Taylor*, 422 Mich 554, 568; 375 NW2d 1 (1985), quoting *People v Roberts*, 19 Mich 401, 416 (1870). Evidence of intent to kill also includes "use of a deadly weapon, taking aim at a victim, injury to the victim, evidence of flight and attempts to hide evidence." *People v Everett*, 318 Mich App 511, 531 n 10; 899 NW2d 94 (2017). Although a victim's injury is admissible as evidence of a defendant's intent, actual injury is not an element of AWIM. *Id*. at 531 n 9.

Michigan also recognizes the doctrine of transferred intent. See *People v Lawton*, 196 Mich App 341, 351; 492 NW2d 810 (1992). When a defendant claims that he intended to kill one particular victim by repeatedly shooting at him, but had no intent to kill a separate victim of whose presence he was unaware, this Court has held that transferred intent applies regardless of whether that second victim was injured. *Id*. at 350-351.

Viewed in the light most favorable to the prosecution, there was sufficient evidence to support the jury's conclusion that defendant had the intent to kill the eight men in the pickup. Defendant had aggressive interactions with both Trent and Quinn. During the interaction with Trent, defendant made homophobic statements. Jake described hearing the commotion and recognized that defendant was "angry." Jake screamed at Trent to stop talking to them (presumably defendant and Anthony). Marcus physically intervened, repeatedly telling defendant to "chill." Anthony, defendant's friend, attempted to get defendant to leave.

After returning to defendant's Jeep, defendant again approached Max's pickup, asking Quinn if they had "Molly, ecstasy," or anything else. Quinn, who had no drugs, showed defendant

his liquor bottle and defendant, who seemed intoxicated, "pretty much demanded a swig [.]" Quinn gave the bottle to defendant, who also seemed a little bit aggressive, and he took a shot. Anthony came up from behind, tapped defendant on the shoulder, motioning "let's get out of here." Defendant left with Anthony and returned to defendant's Jeep, which was backed into a parking spot about two car lengths away from Max's pickup.

Later, as Max reversed his raised four-door F-150 pickup out of its parking spot and stopped, defendant retrieved his semi-automatic pistol and fired it seven times. Trent and Quinn were lying down in the bed of the pickup with Trent on the driver's side. One bullet hit the tailgate on the passenger side of the pickup and was stopped by a brace. Another bullet went through the back window of the lifted pickup and struck Luciano in the face, severely injuring him. That bullet then continued through the front passenger headrest before it hit Jake in the back upper right shoulder, causing a burn or welt.

In sum, after two confrontations in the area of the pickup, defendant repeatedly fired a semi-automatic Glock at it while eight men were loaded inside. Three of the seven bullets defendant fired stuck the pickup, injuring two occupants, one seriously. Defendant then fled the scene and disposed of the weapon, demonstrating a consciousness of guilt. *People v Sharpe*, 319 Mich App 153, 172; 899 NW2d 787 (2017) ("[A]n effort to destroy evidence of the crime" may show "a consciousness of guilt.") *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003), citing *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995) ("[E]vidence of flight is admissible to support an inference of 'consciousness of guilt' and the term 'flight' includes such actions as fleeing the scene of the crime."). All of these factors support the jury's determination that defendant intended to kill all the men in the pickup. *Taylor*, 422 Mich at 568; *Everett*, 318 Mich App at 531 n 9 & 10; *Lawton*, 196 Mich App 350-351.

## VII. SENTENCING

Defendant contends that his out-of-guidelines sentence was disproportionate. "This Court reviews an out-of-guidelines sentence for reasonableness." *People v Lampe*, 327 Mich App 104, 125; 933 NW2d 314 (2019). "Appellate review of departure sentences for reasonableness requires review of whether the trial court abused its discretion by violating the principle of proportionality[.]" *People v Steanhouse*, 500 Mich, 453, 477; 902 NW2d 327 (2017). In turn, the principle of proportionality requires the sentence imposed to be proportionate to the seriousness of the circumstances surrounding the offense and the offender. *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990).

While the sentencing guidelines are only advisory, *People v Lockridge*, 498 Mich 358, 365; 870 NW2d 502 (2015), "the guidelines remain a highly relevant consideration in a trial court's exercise of sentencing discretion that trial courts must consult and take . . . into account when sentencing." *Steanhouse*, 500 Mich at 474-475, quoting *Lockridge*, 498 Mich 391 (quotation marks omitted). Departures from the minimum sentencing guidelines "are appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing." *Milbourn*, 435 Mich at 657. "Factors that may be considered by a trial court under the proportionality standard include, but are not limited to:

'(1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation.' " [*Lampe*, 327 Mich App at 126, quoting *People v Walden*, 319 Mich App 344, 352-353; 901 NW2d 142 (2017) (citation omitted).]

"A trial court must articulate its reasons for imposing a sentence on the record at the time of sentencing." *People v Conley*, 270 Mich App 301, 312; 715 NW2d 377 (2006). The trial court "must justify the sentence imposed to facilitate appellate review," which explains "why the sentence imposed is more proportionate to the offense and offender than a different sentence would have been[.]" *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017) (quotation marks and citations omitted); see also *People v Parkins*, 507 Mich 916; 956 NW2d 507 (2021). If it is unclear why a trial court imposed the sentence it did, "an appellate court cannot substitute its own judgment about why the [out-of-guidelines sentence] was justified." *People v Smith*, 482 Mich 292, 304; 754 NW2d 284 (2008). "A sentencing court's underlying factual findings in support of a sentence are reviewed for clear error." *People v Taylor*, 510 Mich 112, 128; 987 NW2d 132 (2022).

Based on defendant's Prior Record Variable (PRV) Level and Offense Variable (OV) Level, a minimum sentence of 135 to 225 months' (11 years and 3 months to 18 years and 9 months) imprisonment was recommended for defendant's AWIM convictions.[20] The Department

---

[20] Defendant was 31 years old when he committed these crimes, which were his only criminal convictions. Although one of the statements provided to the court at sentencing indicated that defendant "had 16 prior records in the court prior to this shooting," no such information is contained in the PSIR. Defendant's lack of a prior criminal history was considered in the guidelines, MCL 777.51 to MCL 777.57, and the trial court assessed 20 points under PRV 7, MCL 777.57(1)(a), because defendant had "2 or more . . . concurrent convictions[.]"

Turning to defendant's OVs, the trial court assessed: (1) 25 points for OV 1, MCL 777.31(1)(a) (firearm discharged at or toward a human being), (2) 5 points for OV 2, MCL 777.32(1)(d) (offender possessed or used a pistol), (3) 25 points for OV 3, MCL 777.33(1)(c) (life-threatening or permanent incapacitating injury occurred to a victim), (4) 10 points for OV 4, MCL 777.34(1)(a) (serious psychological injury requiring professional treatment occurred to a victim), (5) 15 points for OV 5, MCL 777.35(1)(a) (serious psychological injury requiring professional treatment occurred to a victim's family), (6) 25 points for OV 6, MCL 777.36(1)(b) (the offender had an unpremeditated intent to kill), (7) 10 points for OV 9, MCL 777.39(1)(c) (there were 2 to 9 victims placed in danger of physical injury or death), and (8) 25 points for OV 13, MCL 777.43(1)(c) (the offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person), MCL 777.43(1)(c).

Despite defendant's eight concurrent convictions, only two Sentencing Information Reports ("SIRs") have been provided to this Court on appeal. See *People v Reynolds*, 508 Mich 388; 975 NW2d 821 (2021) ("The [Presentence Investigation Report ("PSIR")] must include the applicable guidelines computation for each different offense in the highest crime class."). Even though the

of Corrections recommended that the trial court impose sentences of 20 to 40 years' imprisonment for the AWIM convictions.[21] The prosecutor asked the trial court to impose minimum sentences of 24 years' imprisonment while three of the victims asked for life sentences.

The sentencing court observed that defendant "fired directly into" Max's pickup more than four times and was lucky he did not kill anyone. The court rejected defendant's testimony that he was "pointing at a tire," noting that Max's pickup was raised. The court also opined that defendant had given his victims life sentences. In particular, Luciano was shot through the head and still undergoing treatment. The court remarked that there was no reason for anyone to shoot "seven times at a vehicle loaded with people." Doing so was "evil" and supported defendant "going away for a very long period of time." The court concluded that a sentence at the low end of the guidelines was not appropriate. Instead, the court explained that "[t]he sheer number of victims" and "the sheer number of bullets that were fired directly into this truck," were "not accounted for under the circumstances of this case." And, when the court imposed the 22 to 40-year sentences as to the seven victims other than Luciano,[22] it explained that the guidelines scoring did not "account for the number of victims and this egregious factual situation." Thereafter, the court imposed the 28 to 45-year sentence as to Luciano without further elaboration.

To the extent that the trial court twice opined that the number of victims was not accounted for by the guidelines, it erred. OV 9 is specifically scored to reflect the number of victims. MCL 777.39. In assessing points for OV 9, the trial court is required to "[c]ount each person who was placed in danger of physical injury or loss of life . . . as a victim," MCL 777.39(2)(a), and to assign "the highest number of points," MCL 777.39(1). A sentencing court must assess 10 points if "[t]here were 2 to 9 victims who were placed in danger of physical injury or death[.]" MCL 777.39(1)(c). In this case, the sentencing court assessed ten points under OV 9 for eight victims.

The sentencing court's second offered reason for imposing sentences in excess of the guidelines recommendation was that defendant's crime was "egregious." This Court has held that "[w]here a defendant's actions are so egregious that standard guidelines scoring methods simply fail to reflect their severity, an upward departure from the guidelines range may be warranted." See *People v Granderson*, 212 Mich App 673, 680; 538 NW2d 471 (1995).[23] The factual scenario

---

scoring of OV 5, MCL 777.35, was based on the prosecutor's representations regarding unidentified family members of the victims, it does not appear that defendant's minimum guidelines range would change if zero points were assessed as to any victim's family. Cf. *Reynolds*, 508 Mich at 397-398.

[21] Despite the trial court striking language that indicated the Department of Corrections' sentence recommendation was within the guidelines, this language remains in the PSIR provided to this Court on appeal.

[22] Defendant mistakenly states that a 28-year minimum sentence was imposed for all of the AWIM convictions.

[23] *Granderson* was decided well before *Lockridge* and under the second edition of the non-binding judicial sentencing guidelines, AO No. 1988-4, 430 Mich xxxi (1988). For a homicide conviction,

in *Granderson* involved a defendant, who had been hired to perform odd jobs for a frail and sickly 69-year-old woman; he not only robbed the woman, but also repeatedly shot her, including in the back, stabbed her over-and-over in the abdomen, and severely beat her, breaking her arm and nose. *Id*. at 675. In this case, on the other hand, the legislative sentencing guidelines accounted for defendant's discharge of a deadly weapon, the life-threatening injury inflicted on Luciano, the serious psychological injury inflicted on the victims, the serious psychological injuries inflicted on their families, the defendant's intent to kill, the number of victims, and the number of AWIMs committed. And, in recounting the circumstances surrounding these offenses, the trial court specifically mentioned "the sheer number of bullets fired directly into this truck." Although there is no dispute that defendant fired seven times in the direction of Max's pickup, only three bullets actually struck it. One bullet went into a tire; a second entered the tailgate and was stopped by a brace; a third severely injured Luciano and hit Jake. As the trial court recognized, defendant's actions certainly could have resulted in death, but they did not.

Given the sentencing court's erroneous determination that the number of victims was not accounted for in the guidelines, its misstatement of facts, and its failure to address the extent of the deviation for all of the out-of-guidelines sentences imposed, we conclude that defendant's sentence was disproportionate. Therefore, we vacate defendant's judgment of sentence and remand for resentencing.[24]

## VIII. INEFFECTIVE ASSISTANCE

Defendant contends that his trial attorneys performed deficiently when they failed to move for an independent criminal responsibility examination. We disagree.

This issue is not properly presented for this Court's review because it was not raised in defendant's statement of questions presented. See MCR 7.212(C)(5). See also *Lowery*, 342 Mich App at 119, n 5. Regardless, a criminal defendant's burden for establishing a claim of ineffective assistance of counsel is well established:

> There is a presumption that counsel was effective, and a defendant must overcome the strong presumption that counsel's challenged actions were sound trial strategy. To establish a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the "counsel"

---

those guidelines permitted a 40-point OV score for torture or sadism, a 25-point OV score for aggravated physical injury or criminal sexual penetration, or zero points. The accompanying instruction explained that "[t]orture or sadism occurs whenever the offender subjected the victim to extreme or prolonged pain or humiliation, apparently inflicted to produce suffering or for gratification of the offender."

[24] Although defendant's Statement of the Questions Presented raises statutory and constitutional protections to challenge his disproportionate sentences, he later contends that his sentences violate the federal and state constitutional protections against cruel or unusual punishment. Given our disposition, we need not address these constitutional issues.

guaranteed by the Sixth Amendment. Furthermore, whether defense counsel's performance was deficient is measured against an objective standard of reasonableness. Thus, to prevail, a defendant must show that counsel's representation fell below an objective standard of reasonableness, and he must show that he was prejudiced by counsel's performance, which can be shown by proving that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.] This Court will not substitute its judgment for that of counsel on matters of trial strategy, nor will this Court use the benefit of hindsight when assessing counsel's competence. The defendant bears the burden of demonstrating both deficient performance and prejudice; the defendant also necessarily bears the burden of establishing the factual predicate for his claim. [*People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015) (quotation marks, citations, and brackets omitted).]

"The role of defense counsel is to choose the best defense for the defendant under the circumstances." *People v Pickens*, 446 Mich 298, 325; 521 NW2d 797 (1994). Defense counsel has wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich 210, 236; 749 NW2d 272 (2008).

Legal insanity is an affirmative defense to a criminal prosecution. MCL 768.21a(1). "An affirmative defense is one that admits the doing of the act charged, but seeks to justify, excuse or mitigate it[.]" *People v Mette*, 243 Mich App 318, 329; 621 NW2d 713 (2000) (quotation marks and citations omitted). The defense of legal insanity may be raised when a defendant suffers from a mental illness or intellectual disability, resulting in a lack of substantial capacity "either to appreciate the nature and quality or the wrongfulness of his . . . conduct or to conform his . . . conduct to the requirements of the law." *Id.* A defendant's voluntary intoxication of alcohol or controlled substance at the time of the offense does not form the basis of an insanity defense solely because he was under the influence.[25] MCL 768.21a(2). At trial, "[t]he defendant has the burden of proving the defense of insanity by a preponderance of the evidence." MCL 768.21a(3). A defendant who can control his behavior and understand that society prohibits his conduct is not insane. *People v Jackson*, 245 Mich App 17, 24-25; 627 NW2d 11 (2001).

Below, defense counsel asserted that defendant had no mental-health issues. And, despite defendant reporting anxiety coinciding with the onset of the COVID pandemic, the PSIR reflects no psychiatric or substance abuse history. When these crimes occurred, the 31-year-old defendant was employed at a mental-health facility and lived in an apartment with his fiancée. On this particular night, defendant testified that he consumed some alcohol, but denied using marijuana, although others in his vehicle did. Defendant further testified that he panicked over the manner in which Max reversed his pickup. Defendant quickly retrieved his Glock, got out of his vehicle, and fired at Max's pickup seven times before fleeing.

Defendant's testimony demonstrates that he made conscious decisions about how to respond to Max reversing his pickup and to flee. Once defendant learned that someone had been injured by his actions, he sought legal representation, and, after consulting with counsel, defendant

---

[25] Nor is voluntary intoxication a defense to committing a crime. See MCL 768.37.

discarded the Glock. Defendant's actions suggest that defendant was aware of the gravity of what he had done and recognized the wrongfulness of his acts.

Because defendant had no history of mental illness and the record reflected that he acted purposefully, defendant has not shown that his two trial attorneys performed deficiently by failing to seek a criminal responsibility determination in order to pursue a potential insanity defense.[26] Nor has defendant shown a reasonable probability of a different outcome. Therefore, defendant is not entitled to relief on his ineffective-assistance-of-counsel claim.

Defendant's convictions are affirmed, but defendant's judgment of sentence is vacated and the matter is remanded for resentencing. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Kathleen Jansen
/s/ Anica Letica

---

[26] We further deny defendant's request to remand for a hearing to expand the record on this issue. See *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).